COMMONWEALTH vs. PAUL N. SMITH.

Plymouth.   December 1, 1969. — April 3, 1970.

Present: WILKINS, C.J., SPALDING, KIRK, SPIEGEL, & QUIRICO, JJ.

*Insanity.   Practice, Criminal,* Place of trial, Jury trial, Capital case,
  Examination of jurors, Ordering verdict, New trial.   *Constitutional
  Law,* Due process of law, Equal protection of laws, Trial by jury.
  *Evidence,* Of insanity, Presumptions and burden of proof.

The transcript of proceedings for selection of a jury for the second trial
  of a murder case made it apparent that newspaper publicity offered
  in support of a motion for change of venue, most of which had occurred
  two or three years before the second trial, did not prevent the selection
  of an impartial and unbiased jury, and there was no error in denial of
  the motion.   [173]
Trial by jury cannot be waived in a capital case.   [173–175]
That trial by jury cannot be waived in a capital case does not deny the
  defendant due process of law or equal protection of laws.   [175]
In a murder case in which insanity of the defendant was an issue, that
  issue was for the jury and it was proper to deny a motion for a di-
  rected verdict of not guilty by reason of insanity even if the only
  evidence presented on that issue was expert testimony to the effect
  that the defendant was insane at the time of the crime under the rule
  of *Commonwealth* v. *McHoul,* 352 Mass. 544.   [177]
No abuse of discretion and no error was shown in the denial of a motion
  for a new trial of a capital case which raised no questions of law other
  than those raised either before or during the trial.   [181]
On review of a second trial in a capital case pursuant to G. L. c. 278,
  § 33E, as amended by St. 1962, c. 453, where the principal issue at
  both trials was the defendant's mental capacity at the time of the
  commission of the crime and at each trial the jury returned a verdict
  of guilty of murder in the first degree, it was held that justice did not
  require a new trial or the entry of a verdict of a lesser degree of guilt.
  [182]

INDICTMENT found and returned in the Superior Court on
September 21, 1965.

The case was tried before *DeSaulnier,* J., in April, 1968.

*Edward H. Stevens* for the defendant.

*Robert L. Anderson,* District Attorney, for the Common-
wealth.

QUIRICO, J.    The defendant was tried on an indictment charging him with the crime of murder in the first degree allegedly committed on July 29, 1965.    He was found guilty by a jury in March, 1966.    The jury did not recommend that the sentence of death be not imposed.  G. L. c. 265, § 2.    On appeal this court reversed the conviction on January 4, 1968, in *Commonwealth* v. *Smith*, 353 Mass. 487.    The reversal was not for any legal error in the trial, but because of this court's reconsideration and restatement of the law of insanity as affecting criminal responsibility in *Commonwealth* v. *McHoul*, 352 Mass. 544, decided on May 16, 1967.

The defendant was brought to trial a second time and, on April 26, 1968, he was again found guilty of murder in the first degree with a recommendation by the jury that the sentence of death be not imposed.    The mandatory punishment of "imprisonment in the state prison for life" was imposed upon him.    G. L. c. 265, § 2.    The case was tried subject to G. L. c. 278, §§ 33A–33G, and it is here on the defendant's appeal.    The defendant alleges errors by the trial court in the denial of the following motions: (1) motion for a change of venue;  (2) motion to waive jury; (3) motion that prospective jurors be questioned about opinions on insanity as a defence;  (4) motions for directed verdicts of not guilty by reason of insanity;  and (5) motion for a new trial.

The defendant is charged with the murder of Ellen I. Gamache (victim), a five year old resident of the town of Middleboro, Massachusetts.    The victim and her two brothers, eight and twelve years old, respectively, went to a public playground and swimming pool in Middleboro in the early afternoon of July 29, 1965.    About 1:30 P.M. that day the victim was seated beside the defendant near the swimming pool.    The defendant's car bearing New Hampshire registration plates was at the playground that afternoon. About 2:30 P.M. the car was driven by a man from the direction of the swimming pool toward the "kiddy-corner" part of the playground where the victim's brothers had last seen her.    About 3:30 P.M., the defendant drove his car to

the town dump which was a couple of miles from the center of town, walked about the area and left.

About 4 P.M. the victim's brothers looked for her to go home, but they did not find her. They returned home, and looked for her in the neighborhood. About 6 P.M. their mother notified the police that her daughter Ellen was missing. She was last seen alive at the playground on the afternoon of that day. The police and many other persons engaged in an extensive search for her. Her badly decomposed body was found on August 8, 1965, in a wooded area about 1,000 feet off Montgomery Street in Lakeville, Massachusetts. It had four stab wounds. The vagina was markedly distended. There was some bleeding and hemorrhage at the point where the vagina joins the uterus. Paint chips found on a tree and on the ground near the body were similar in texture and color to the paint on the defendant's car. One chip fitted a chipped area of the paint on the left front fender of the defendant's car. A microscopic examination of debris from the front seat of the car showed the presence of dog hair and of nine different types and colors of cotton, wool and rayon fibers. A similar examination of part of the clothing on the victim's body when it was found showed the presence of the same type of dog hair and the same types and colors of fibers as found on the car seat.

For about two weeks prior to July 29, 1965, the defendant had been staying at the home of his brother in Middleboro. On that day he was at the home for about five minutes at 4 P.M. He left and returned about 7 P.M. saying he had been to Boston to see about getting into the service. About 12:05 P.M. on the next day he sold his car to one Mable for $20 and agreed to deliver it to him that evening. He never delivered it. About 3 P.M. the next day, July 31, he sold his car to a junk dealer in Newport, New Hampshire, for $15 and he took the registration plates with him at the buyer's request. The plates were found on August 10, 1965, below a bureau drawer in a hotel room in Windsor, Vermont.

Between 9 and 10 P.M. on August 1, 1965, the defendant arrived at the home of Mrs. Laura Selby, his former mother-in-law, at Schenectady, New York. He brought with him a brown suitcase he had taken from his brother's home. He spent the night there. The next morning an agent of the Federal Bureau of Investigation came to the house and spoke to Mrs. Selby about the defendant. The defendant was in a bedroom of the house at the time, and he remained there. After the agent left, Mrs. Selby told the defendant that the agent wanted to inquire about a little girl. The defendant said he knew nothing about a little girl. He left about ten minutes later, without his suitcase. A stain from human blood was found on the defendant's trousers in the suitcase. There were also bloodstains on a knife and a T-shirt in the suitcase, but it could not be determined whether they were from human blood. The defendant was arrested in Newbury, Vermont, on August 9, 1965.

About March 17, 1968, while the defendant was at the Plymouth County jail awaiting his second trial, he told another inmate that all he "did to the little girl was smother her," and that he did not stab her. He made the same statement to a psychiatrist who testified on his behalf at the second trial.

1. The first error alleged by the defendant is the denial of his motion to change the venue of the trial to Suffolk County. The motion alleged "that due to the publicity received by way of television, radio, and newspaper publication, public opinion is such that it would be impossible for the defendant to have an unbiased jury for a fair trial either as to the guilt or innocence of the defendant, or as to the jury's recommendation as to the penalty." The motion was not verified by affidavit. It was heard on March 28, 1968, and denied on April 3, 1968. The trial commenced on April 23, 1968.

At the hearing on the motion the defendant introduced sixty-three news items which had appeared in three newspapers in Taunton, Brockton and New Bedford. Forty-two of the items were published between July 30 and August 11,

1965.   They related to the victim's disappearance, the search for her, the finding of her body and the defendant's arrest.   Fourteen items published between February 3 and March 22, 1966, related to the defendant's first trial.   One item published June 1, 1966, reported the denial of a motion for a new trial.   Another published May 24, 1967, reported that the defendant was appealing to this court after the conviction in his first trial.   Five items published on January 4 and 5, 1968, reported that this court had ordered a new trial of the case.   The last item published March 14, 1968, reported that the defendant's second trial would start the following month, and referred to the earlier conviction, appeal and reversal.   Counsel stipulated that a newspaper in Quincy had published an item about evidence introduced at the first trial on March 18, 1966, but it was not marked as an exhibit.   The defendant presented no evidence of any radio or television publicity about the trial at the hearing on this motion.

The trial judge interrogated fifty-two veniremen individually in the empanelling of the jury of sixteen members. G. L. c. 234, § 26B.   The interrogation was under oath and included all of the questions usually put to veniremen in capital cases.[1]   The judge also asked each venireman whether he had read or seen anything about the case in the newspapers which would prevent him from "giving a fair and impartial trial to this defendant."   Only one person said he had formed an opinion on the basis of what he had heard or read, and he was excused by the court.   One person who said she had read something about the case but could not recall what she had read was excused for other reasons.   Five persons said that although they had read something about the case they could act fairly and impartially, and the judge declared them indifferent.   Four of

---

[1]The questions were those required by G. L. c. 234, § 28, and c. 278, § 3. Each venireman was also asked whether he had an opinion that would prevent him from recommending that the death sentence be not imposed in the event that the defendant was found guilty of murder in the first degree.   See *Commonwealth* v. *Ladetto*, 349 Mass. 237, 245; *Commonwealth* v. *Nassar*, 354 Mass. 249, 255; *Witherspoon* v. *Illinois*, 391 U. S. 510, 516–518.

them were challenged by the defendant, and the fifth was seated as a juror. Since the judge excused any venireman whose answers in the voir dire examination indicated any question as to his impartiality or indifference, no venireman was challenged for cause. The defendant took no exception to the seating of any juror or to the exclusion of any prospective juror who was interrogated. He exercised only fifteen of the sixteen peremptory challenges to which he was entitled. G. L. c. 234, §§ 26, 26B and 29. As to each of the sixteen jurors who were seated, the defendant stated, through counsel, that he was "content" with the juror, or that the juror was "satisfactory" to him. *Commonwealth* v. *Blackburn,* 354 Mass. 200, 204.

On this record there was no error in the denial of the motion for change of venue. Most of the newspaper publicity which the defendant presented in support of his motion had occurred in two parts, one two years and the other three years before the present trial. It is apparent from the transcript of the proceedings for the selection of the jury that the publicity did not interfere with, or prevent the selection of, an impartial and unbiased jury for the second trial. The power of the court to allow a change as to the place of a trial by jury "should be exercised with great caution and only after a solid foundation of fact has been first established." *Crocker* v. *Superior Court,* 208 Mass. 162, 180. There is no such foundation in this case. See *Commonwealth* v. *Millen,* 289 Mass. 441, 463; *Commonwealth* v. *Sheppard,* 313 Mass. 590, 594; *Commonwealth* v. *Bonomi,* 335 Mass. 327, 332–333; *Commonwealth* v. *Blackburn,* 354 Mass. 200, 203–204; *Commonwealth* v. *Wilson,* 355 Mass. 441, 445.

2. The second error alleged by the defendant is the denial or rejection of his attempted waiver of trial by jury. On April 23, 1968, before the empanelling of a jury, the defendant offered for filing a document signed by him and witnessed by his counsel, reading: "Now comes the defendant Paul N. Smith and in accordance with statutes in such cases made and provided waives his right to trial by jury."

The trial judge treated the document as a motion and he indorsed his denial thereon.

The statutes pertinent to this issue are the following: (a) General Laws c. 278, § 2, as amended by St. 1929, c. 185, § 2: "Issues of fact joined upon an indictment or complaint shall, in the superior court, be tried by a jury . . . unless the person indicted or complained against elects to be tried by the court as provided by law." The 1929 amendment inserted the language starting with the word "unless"; otherwise the statute has remained unchanged since 1836. (b) General Laws c. 263, § 6, as amended by St. 1929, c. 185, § 1: "Any defendant in the superior court *in a criminal case other than a capital case* . . . may . . . waive his right to trial by jury by signing a written waiver thereof and filing the same with the clerk of the court, whereupon he shall be tried by the court instead of by a jury" (emphasis supplied). (c) General Laws c. 265, § 1, defining the crime of murder, concludes: "The degree of murder shall be found by the jury." This language has remained unchanged since 1858.

The first statutory enactment of authority for the waiver of a jury in the trial of a criminal case in this Commonwealth was St. 1929, c. 185, amending G. L. c. 263, § 6, and c. 278, § 2, as indicated above. The enactment was probably brought about by the 1926 decision in *Commonwealth* v. *Rowe*, 257 Mass. 172. That case held that the Superior Court was without jurisdiction to try disputed facts on a criminal indictment without a jury. The decision read in part at p. 180: "It is true that the Superior Court, although created by statute, is a court of general jurisdiction . . . [b]ut this does not prevent specific limitation of its powers by statute. Such limitation does exist. The Legislature, which imposed the limitation, can remove it. In so doing, it will be acting within its constitutional powers, as the right of the accused to a jury trial on disputed facts will not be lessened." By St. 1929, c. 185, the Legislature did remove the limitation, as the court suggested it could do, but it removed it only as to a criminal case "other than a capital

case." Since the amendment, just as before, the Superior Court's jurisdiction to try capital cases has been limited to trying them with a jury as an indispensable part of the court for such trials.

The attempt by the defendant to waive trial by jury in this case is governed by the decision in *Commonwealth* v. *Millen*, 289 Mass. 441, 465, holding that such an attempt was nugatory. In so holding, the court said: "Our law provides for no form of trial in a capital case, whether the defendants choose to waive their constitutional right to jury trial or not, except trial by jury. G. L. (Ter. Ed.) c. 263, § 6. St. 1933, c. 246. Obviously that ancient and valued mode of trial cannot be said to lie outside the scope of due process of law. . . . It is no sound constitutional objection to our statute, that it gives to defendants in noncapital criminal cases, with some exceptions, a right to trial without jury, while requiring capital cases to be tried by jury. The constitutional guaranty of the equal protection of the laws does not prevent reasonable classification, and differences in practice resulting from such classification. . . . The statute in question makes only a reasonable classification in providing that a man's life shall not depend upon findings of fact made by one man." *Singer* v. *United States*, 380 U. S. 24, reaches the same conclusion under applicable provisions of the Constitution and laws of the United States.

There was no error in the judge's denial of the defendant's attempted waiver of trial by jury in this case.[2]

3. The third error alleged by the defendant is the denial of

---

[2] If the law were otherwise, certain serious problems would confront the trial court, and even more acutely, the defendant: (a) In a trial without jury could the judge find "the degree of murder" which G. L. c. 265, § 1, says "shall be found by the jury"? If the indictment charged murder in the first degree would the judge be precluded from finding a defendant guilty of murder in the second degree? (b) If a defendant were convicted of murder in the first degree in a trial without jury, would the punishment be limited to a sentence of death? General Laws c. 265, § 2, says that is to be the punishment "unless the jury . . . recommend that the sentence of death be not imposed." Does that statute permit the judge to make such a recommendation to himself? These statutes indicate a clear legislative intent that the jury are still an indispensable part of the required tribunal for the trial of a capital case.

his motion that each prospective juror be asked a special question relating to the defence of insanity.[3] There was no error in the denial of this motion. It has long been held that the trial judge has discretion in deciding whether prospective jurors should be asked any questions in addition to those prescribed by statute (G. L. c. 234, § 28, and c. 278, § 3). *Commonwealth* v. *Millen,* 289 Mass. 441, 475–476. *Commonwealth* v. *Lee,* 324 Mass. 714, 717. *Commonwealth* v. *Taylor,* 327 Mass. 641, 647. *Commonwealth* v. *Geagan,* 339 Mass. 487, 503. *Commonwealth* v. *Nassar,* 351 Mass. 37, 40–41. *Commonwealth* v. *Martorano,* 355 Mass. 790.

This rule has been applied in several cases upholding the trial judge's refusal to ask prospective jurors questions specifically relating to insane persons, insanity as a defence in criminal cases, and psychiatrists as witnesses. *Commonwealth* v. *Spencer,* 212 Mass. 438, 445. *Commonwealth* v. *Harrison,* 342 Mass. 279, 283. *Commonwealth* v. *Ricard,* 355 Mass. 509, 511–512.

4. The fourth and fifth errors alleged by the defendant are the denial of his two motions filed at the close of all the evidence requesting that the jury be directed to return verdicts of "Not guilty . . . by reason of insanity" on the charges of murder in the first degree and murder in the second degree. Apart from the issue of insanity, there was evidence warranting a finding that the defendant committed the crime of murder in the first degree or murder in the second degree. The defendant does not now contend that there was error in the denial of the motions which requested directed verdicts of not guilty on the evidence generally.

The words "sane," "insane," "sanity," and "insanity" as used in this opinion relate only to the test of criminal responsibility prescribed in *Commonwealth* v. *McHoul,* 352 Mass. 544, 546–547, 555. That test is as follows:

---

[3] The question was: "If the evidence warrants a finding that the defendant is guilty of murder and the evidence further warrants a finding that the defendant had a mental disease at the time of the alleged crime, and as a result of this mental disease, he did not have substantial capacity to conform his conduct to the requirements of law, have you any opinions that would prevent you from finding the defendant not guilty by reason of insanity?"

"A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law." Am. Law Inst., Model Penal Code, Proposed Official Draft (1962) § 4.01.

The Commonwealth had the burden of proving that the defendant was sane at the time of the crime alleged against him. The only testimony concerning his mental condition came from two psychiatrists, Dr. Robert R. Mezer and Dr. Ames Robey, the only witnesses to testify for the defence. The defendant did not testify, and he waived his right to make an unsworn statement to the jury after the close of the evidence. *Commonwealth* v. *Dascalakis*, 246 Mass. 12, 32. *Commonwealth* v. *Stewart*, 255 Mass. 9, 14–19. Each psychiatrist testified about the history he received from or about the defendant, his own observations and examinations of the defendant, and his findings and opinions on the defendant's mental condition. Each concluded his testimony on direct examination by stating that in his opinion the defendant was insane within the meaning of the *McHoul* case on the date of the crime charged against him.

The defendant contends in his assignments of error that "all of the evidence pertaining to insanity was that the defendant was legally insane at the time of the commission of the crime; [therefore] the jury had nothing to consider as to the sanity of the defendant." He contends further that on this state of the evidence the jury were compelled as matter of law to find the defendant not guilty by reason of insanity, and therefore that the court was compelled as matter of law to direct them to return such a verdict. If this contention were correct it would mean that the Commonwealth could never be held to have sustained its burden of proving a defendant sane at the time of an alleged crime if the defence presented psychiatric testimony that he was insane and the Commonwealth presented no evidence that he was sane. That is not the law of this Commonwealth.

In *Commonwealth* v. *Cox,* 327 Mass. 609, 613, we held that it was not error to deny a motion for a directed verdict of not guilty by reason of insanity where the only evidence on that issue was the uncontradicted testimony of two psychiatrists in the employment of the Commonwealth, but who were called as witnesses by the defendant, and testified that he was insane.[4]  We reached the same conclusion in *Commonwealth* v. *Hartford,* 346 Mass. 482, 489, and *Commonwealth* v. *Ricard,* 355 Mass. 509, 514.   In the latter case we said: "Undoubtedly the expert testimony . . . [that the defendant was insane] permitted a finding of criminal irresponsibility.  But it was not a required conclusion; the absence of expert opinion to counter that of Dr. Barrows [the psychiatrist testifying for the defence] did not require it."

Whether the defendant was sane or insane on the date of the alleged crime is one of the issues of fact which in a capital case must "be tried by a jury." G. L. c. 278, § 2. The jury are also the sole judges of the credibility and weight of all of the evidence on the issue of insanity.  That includes the testimony of psychiatrists, whether it consists of statements of facts or opinions.  The jury are not compelled to believe any such testimony or opinions, and the court cannot order them to do so by directing them to return verdicts of not guilty by reason of insanity.  Judicial experience with psychiatric testimony makes it abundantly clear that it would be unrealistic to treat an opinion on insanity by an expert on either side of the issue as conclusive.  That is no less so in a case where one party has not secured an expert to express a contrary opinion.  The law should not, and does not, give the opinions of experts on either side of the issue the benefit of conclusiveness, even if there are no contrary opinions introduced at the trial.

There is another and equally important reason why a

---

[4] Although the uncontradicted psychiatric testimony was a factor in our reversal of the conviction and order for a new trial in this case, our action was not based on any legal error in denying the motion for a directed verdict.   We acted under the broad powers of review of law and fact in capital cases under G. L. c. 278, § 33E.

court cannot direct a jury to return a verdict of not guilty by reason of insanity even though the only evidence on the issue is that the defendant was insane at the time of the alleged crime, and the evidence is uncontroverted. That reason, as stated in *Commonwealth* v. *Clark*, 292 Mass. 409, 415, is that "although the burden of proof is on the Commonwealth to prove the defendant mentally responsible for crime . . . the fact that a great majority of men are sane, and the probability that any particular man is sane, may be deemed by a jury to outweigh, in evidential value, testimony that he is insane." That language has been repeated with approval and applied in a number of our cases, including the *Cox, Hartford* and *Ricard* cases, *supra*, and in *Commonwealth* v. *Francis*, 355 Mass. 108, 111.

It is clear from the *Clark* opinion that the rule which it states does not merely create a presumption in favor of sanity which disappears from the case the moment evidence to the contrary is introduced. In citing several earlier cases as supporting the same rule, it says of them (at 415) that "the form of expression may be criticised on the ground that in truth it is not, as stated in those cases, the presumption of sanity that may be weighed as evidence, but rather the rational probability on which the presumption rests." The *Clark* case is cited in *Connolly* v. *John Hancock Mut. Life Ins. Co.* 322 Mass. 678, 681–682, as one of "many instances of adjudicated permissible inferences as to the normal mental capacity . . . of persons." It is cited in *Krantz* v. *John Hancock Mut. Life Ins. Co.* 335 Mass. 703, 712, as permitting an inference of sanity.

Under the rule of the *Clark* case, in deciding the issue of insanity in a criminal case, the jury may infer that the defendant is sane from their common knowledge of the fact that a great majority of men are sane, and of the probability that any particular man is sane. It is for the jury to decide in each case whether they draw that inference. Their power to do so is not limited to cases where there is no psychiatric evidence to the contrary. If they draw that inference, it is for them to decide what weight they will

give to it in the light of all of the evidence introduced on the issue. They may deem it to outweigh, in evidential value, psychiatric or other evidence that the defendant is insane. These are decisions to be made by the jury, and the court cannot direct the jury how they shall decide thereon.

In the *Ricard* case, *supra*, at 470, we said: "The probability that any particular man is sane may be of slight if any weight in the face of unanimous psychiatric opinion to the contrary, where it is plainly apparent from the evidence that the act committed is not one that a sane person would have committed, there being no circumstances (anger, revenge, rejection, jealousy, hatred, insult, intoxication, or the like) to account for the murderous act by a sane person." Somewhat similar language appears in the *Francis* case, *supra*. That language is a correct statement of some of the factors which a jury may consider in deciding whether to draw the inference of sanity under the *Clark* rule, and, if the inference is drawn, what weight to give to it in relation to the other evidence on the issue. However, it should not be understood as indicating any departure from, or limitation of, the *Clark* rule. Specifically, it should not be understood as permitting or requiring a trial judge to direct a verdict of not guilty by reason of insanity in any criminal case tried by a jury, and by so doing to usurp the power of the jury as the sole judges of this factual issue.

Finally, while it is immaterial for the purpose of this decision whether, as claimed by the defendant, "all of the evidence pertaining to insanity was that the defendant was legally insane at the time of the commission of the crime," we feel constrained to say that the claim is not correct. Although Dr. Robey ultimately concluded that the defendant was insane, that was not the initial staff diagnosis when the defendant was first committed to the Bridgewater State Hospital on August 11, 1965. That diagnosis was that the defendant then "certainly appeared to be in good contact with reality, he was oriented [and] we couldn't find any memory loss. He appeared of approximately average intelligence and we saw no signs of any overt psychosis." The

initial diagnosis was that of a "sociopathic personality disorder with sexual deviation," which Dr. Robey said was not a mental disease. No purpose would be served in trying to summarize all of the psychiatric evidence. It is sufficient to say that not all of it tended to prove that the defendant was insane.

5. The sixth error alleged by the defendant is the denial of his motion for a new trial filed three days after the verdict of the jury. The motion alleges that the verdict was against the evidence, contrary to the evidence and unwarranted by the evidence, against the evidence and the weight of the evidence, and against the evidence, the weight of the evidence presented and the law. The motion raised no questions of law other than those raised either before or during the trial. It was addressed to the discretion of the judge, and his action in denying it must stand unless there was a clear abuse of discretion. No such abuse of discretion is shown. There was no error in the denial of the motion. *Commonwealth* v. *Cero,* 264 Mass. 264, 274–275. *Commonwealth* v. *Noxon,* 319 Mass. 495, 550.

Although we find no error of law in the conduct of the trial, we have an additional function in this case: to consider the whole case broadly on the law and the facts to determine whether there was any miscarriage of justice, without being limited to the errors specifically assigned by the defendant. G. L. c. 278, § 33E, as amended by St. 1962, c. 453. The statute imposing this duty on us "does not, however, convert this court into a second jury, which must be convinced beyond a reasonable doubt of the guilt of a defendant by reading the reported evidence, without the advantage of seeing and hearing the witnesses"; but it "does give us the power and the duty exercised by a trial judge upon a motion for a new trial." *Commonwealth* v. *Gricus,* 317 Mass. 403, 406–407. *Commonwealth* v. *Cox,* 327 Mass. 609, 614–615. The statute also requires us to consider the degree of guilt, and to direct the entry of a verdict of a lesser degree of guilt if we are of the opinion that the ends of justice require such action. This goes beyond

the power of the trial court to grant a new trial. *Commonwealth* v. *Baker*, 346 Mass. 107, 109, 119.

In accordance with the duty imposed upon us by the statute, we have reviewed the entire record and evidence in this case. The defendant has now had the benefit of two complete trials. Each was before a different judge and jury. The principal factual issue before the jury in each trial was the defendant's mental capacity as bearing upon his responsibility for otherwise criminal conduct. In each trial the jury were instructed that one of the verdicts which they were permitted to return was that the defendant was not guilty by reason of insanity. In each case they returned a verdict of guilty of murder in the first degree, thus finding that the defendant met the legal test for criminal responsibility. The verdict in the first trial was without recommendation that the death sentence be not imposed; thus that mandatory sentence was imposed. The verdict in the second trial did include such a recommendation and a life sentence was imposed. Both trials were free from legal error. After careful consideration we are of the opinion that justice does not require a new trial or the entry of a verdict of a lesser degree of guilt. The judgment is affirmed.

*So ordered.*