Agnes, A. J.
The defendant, Eric Morasse, is charged in a series of indictments with assault with intent to maim, assault and battery by means of a dangerous weapon, assault by means of a dangerous weapon, and assault and battery arising out of an incident *116 which occurred on May 13, 1999 in which the defendant is alleged to have struck and injured a number of people including the infliction of a severe cut to his girlfriend’s arm with a Samurai sword during an alcohol-induced blackout. The defendant has been under various forms of pretrial probation supervision since January 1999. The parties agree that there is a “substantial question of possible doubt,” Commonwealth v. Valles, 360 Mass. 522 (1971) (quotation omitted),[1] regarding the competency of the defendant, and, accordingly, the court conducted a hearing.
FINDINGS OF FACT
Based on the credible evidence presented at the hearings in this case, including the reports of the expert witnesses,[2] the court makes the following findings and rulings. The defendant was arrested by the Lawrence Police Department during the morning hours of May 31, 1999, and was transferred to the Bayridge Hospital in Lynn because of concerns about his mental health. He spent 30 days at the Bridgewater State Hospital as a result of an order pursuant to G.L.c. 123, §35. He was returned to the Lawrence District Court on July 2, 1999. Thereafter, he was released on pretrial probation under electronic monitoring. His medical records and the report by Dr. Oman indicate that the defendant was hospitalized the following day, July 3, 1999, due to the ingestion of a large amount of prescribed medication in what may have been a suicide attempt. After two days in the intensive care unit, he was transferred to the Bayridge Hospital where he was treated for depression.
He was arraigned in the Salem Superior Court on September 2, 1999. The court clinician, Dr. David Swenson, examined him and recommended a period of further evaluation on account of the defendant’s prior history and because the defendant did not at that time understand what a judge, a jury or a prosecutor was, and did not appear to be able to give his counsel any rational assistance. He was admitted to the Hathorne Mental health Unit of Tewksbury Hospital on September 2, 1999 and remained there for the duration of two thirty-day orders under G.L.c. 123, § 15(b).
At the hearing before this court, the Commonwealth called Dr. Richard N. Oman, Ed.D. who conducted the forensic evaluation of the defendant at the Tewksbury Hospital in 1999 and interviewed him again in May 2001.
Dr. Oman is a clinical psychologist at the Tewksbury Hospital where he has worked for the past 15 years. He obtained a graduate degree in counseling and psychology from Boston University. Dr. Oman has 20 years of experience as a clinical psychologist and has served the Commonwealth as a designated forensic psychologist for the past 10 years.
Dr. Oman advised the defendant of his so-called Lamb warnings, see Commonwealth v. Lamb, 457 Mass. 168 (1970), before proceeding with his examination. The defendant is a learning disabled individual with particular weakness in the area of verbal reasoning. The defendant described himself as depressed, but appeared to have a “happy go lucky” personality, a good appetite, and to sleep well. The defendant did not have auditoiy hallucinations. The defendant was observed to play cards with others in the hospital’s day room. His physical appearance was that of a neat and tidy person and did not, according to Dr. Oman, fit the profile of a person with severe depression. It is Dr. Oman’s opinion that the defendant also does not fit the profile of a mentally retarded person. However, on cross-examination, Dr. Oman conceded that the defendant’s performance on the Weschler IQ test (65-75 range) put him in the extremely low range with reference to vocabulary, verbal intelligence, and verbal comprehension, and that according to the scale used with that test he was in the “borderline” mentally retarded range. Dr. Oman’s explanation was that “I don’t think he (the defendant) gave his best effort.”[3]
The defendant has a driver’s license and can read.[4] The defendant does not process abstract information very well. He can put puzzles together and can sequence behavior, but cannot perform tasks that require verbalization. The defendant does not read newspapers or listen to the news. Dr. Oman did not find psychological testing very helpful in assessing this defendant’s competency.
Dr. Oman had an opportunity to examine the defendant in court for 30-45 minutes on May 30, 2001. Dr. Oman gave him a “simplified” version of the Lamb warnings which he appeared to understand. The defendant is not in custody, but rather lives with his father, reports regularly to the probation department, and attends a day program. Dr. Oman opined that the defendant’s affect seemed “brighter” than he seemed in several years. The defendant smiled, laughed, and seemed more responsive. The defendant was able to list the medications he was taking (Prozac, Thorazine, Zyprexa) including their amounts and their frequency, and what he had eaten for his daily meals. The defendant told Dr. Oman and staff that he was sober and that he “felt good.” The defendant’s answers to questions were cogent and more informed about his attorney and the role of his attorney than on previous occasions, and the defendant spoke well of his relationship with his. attorney.
It was Dr. Oman’s opinion, which I credit, that the defendant does not suffer from any major mental illness, does not exhibit signs of psychosis, but rather than he is severely learning disabled, has an alcohol and drug abuse problem, and has some depression. Dr. Oman also noted that the defendant does not exhibit any signs of thought, perception, or mood disorders.
Dr. Oman also testified, and I find, that the defendant understands the charges against him and the possibility that if he is convicted he could face time in *117 jail. This is a matter about which the defendant is “nervous and scared.” Dr. Oman testified and I find that the defendant has a general understanding of the roles of the judge, the prosecutor, the defense counsel, and the process of trial by jury. Dr. Oman expressed the opinion that the defendant had the capacity to form an opinion about what is in his best interests.
Even though he has a low IQ level, Dr. Oman, does not believe that the defendant fits the criteria for mental retardation. Dr. Oman testified that the defendant seemed “future oriented” and “goal oriented.” The defendant is participating in a day program, is in compliance with his drug treatment program, and is taking his medications as ordered.[5]
Dr. Oman stated that in 1999 he formed an opinion, to a reasonable degree of scientific certainty, that the defendant met the legal requirements for competency, and that based on his more recent interview with and observations of the defendant, he reached the same opinion again. Dr. Oman described the defendant as a person with “functional intelligence” who has demonstrated an ability to follow a treatment plan, to manage his money, and to form relationships with others (defendant was married for a time). Nonetheless, this opinion was qualified by Dr. Oman’s further opinion that given the severe limits on the defendant’s verbal skills, it would be necessary for the defendant’s lawyer to assist him with explanations of some of the legal concepts and roles of the lawyers, the judge, and the jury.
There also was testimony from Ms. Nadine Murkison, Assistant Chief Probation Officer in Essex County Superior Court who has 14 years as a probation officer. The defendant is under the supervision of the probation department and has been in the electronic monitoring program. She has supervised the defendant for the past two years and met regularly with him during that time. She described him as “intellectually slow.” Ms. Murkison, who is an experienced probation officer, had the most contact with the defendant over • the past several years. I credit her testimony that the defendant appears to understand the difference between right and wrong, was capable of following her directions by obtaining medical records when asked and by reporting to the court on days and at times she requested, and did not exhibit any inappropriate behavior other than occasional moodiness.
The final witness to testify was Dr. Paul Spiers, a forensic psychologist, who has a Ph.D. from Clarke University in clinical psychology and clinical neuropsychology. He has published book chapters and 20 articles which have appeared in peer reviewed psychology journals.[6] Dr. Spiers has a private forensic practice with a business known as Neuropsychology Associates, conducts research at M.I.T., and teaches at the Harvard and Boston University Medical Schools. He has previously been qualified to testify as an expert in forensic psychology in the trial courts of the Commonwealth of Massachusetts as well as in other jurisdictions. Dr. Spiers met with and examined the defendant on several occasions. He reviewed the defendant’s medical and academic records, relevant police reports and the evaluations conducted by Dr. Oman.
Dr. Spiers opined that the defendant presented a “complex picture” of a person with a long history of depression with “schizoid features,” learning disabilities and substance abuse problems. He indicated that the defendant fits the criteria in the Diagnostic and Statistical Manual of Mental Disorders IV (“DSM IV”) for “mildly mentally retarded.” He also opined that the defendant had “biological predisposition” to mental illness in that he had a family history of psychological problems[7] and a history of pathological intoxication.[8] Although there is no DSM IV diagnostic criterion known as “biological predisposition” to mental illness, it was a valid description, in his opinion, of people who are more vulnerable than the average person to the neurochemical effects of alcohol. Dr. Spiers also opined that while the defendant denied any history of seizures, his reports of intermittent blackouts at times he was not intoxicated and episodes of dizziness may be related to a history of head injury in childhood and a trigger for his depression.[9] However, Dr. Spiers did not suggest a direct cause and effect relationship between any head injuries that the defendant may have suffered and his competence, and insofar as organic brain disorder may be postulated as a basis for a claim that the defendant is not competent, I find it to be speculative.
Dr. Spiers testified that he employed a new instrument to assist in evaluating the competency of the defendant known as the MacArthur Competence Assessment Tool (MCAT). This instrument which was developed by the MacArthur Research Network on Mental Health and the Law[10] poses hypothetical situations that could arise in the context of a criminal trial and seeks to measure subject’s capacity to respond and thus his or her understanding of situations that might arise in the trial setting.
It was also the opinion of Dr. Spiers that the traditional approach to the assessment of competency by means of structured interviews is far less studied than is the approach using standardized tests such as the MacArthur Competency test. The test includes factual scenarios designed to test the subject’s understanding of the roles of personnel, the subject’s ability to reason (the impact or significance of certain facts to the outcome of a case), and the subject’s appreciation for decisions that are made (what outcome will result from a particular course of action selected by the defendant). On the Understanding portion of the test, the defendant’s score was in the range of clinically significant impairment and 26% of persons with this score were confirmed to be incompetent. According to Dr. Spiers, the defendant’s reasoning score was better, but *118 63% of persons with this score were confirmed to be incompetent and less than 15% of persons found to be competent scored at the level that was achieved by the defendant. The defendant achieved his best score on the Appreciation portion of the task.
According to Dr. Spiers, only a small percentage of the individuals who achieved scores such as those received by the defendant were determined to be competent. Dr. Spiers conceded that the fact components of this test do not have built in controls against malingering and that much is left to the judgment of the person administering the test. However, he added that he had conducted other tests that were designed to identify whether the subject was lying and that this was not a concern with this defendant.[11] Dr. Spiers also testified that the results of the defendant’s performance of the Texas Competency Instrument, a multiple choice test involving a large number of questions, confirmed his assessment that the defendant was not competent.
Dr. Spiers also described certain tests administered to the defendant by or under the direction of Dr. Oman, including the Weschler Adult Intelligence Scale III (WAISIII), the Thematic Apperception Test, the Rorschach Inkblots test, and the Minnesota Multiphasic Personality Inventory-2 (MMPI 2). On the WAISIII test, the defendant’s score placed him in the range for mental retardation. His verbal intelligence quotient was in the 1st percentile in comparison to age-matched peers as well as his Verbal Comprehension Index which is a measure of a person’s ability to understand and process orally material that is presented verbally. In terms of the Working Memory Index, a measure of ongoing processing ability for verbal information, the defendant scored in the 5th percentile. His non-verbal intellectual skills were better. However, his full scale I.Q. was still only one point above the level that previously required a diagnosis of mental retardation. It was Dr. Spiers opinion that the more intact spatial abilities of the defendant masked his great deficits in terms of verbal intelligence and made him appear to be more competent than he really is, and that, as a result, he might require that things be repeated 4-5 times for him to understand. The results of the MMPI test supported his diagnosis that the defendant had psychiatric problems.
Dr. Spiers also testified that a shortcoming with the structured interview approach to competency evaluation such as that used by Dr. Oman is that when the examiner explains things that the subject does not understand he steps out of his role as an evaluator and becomes a helper and that this distorts the validity of his findings. In such cases, it is incumbent on the examiner to reevaluate the subject and to measure whether the subject has learned anything.
It was the opinion of Dr. Spiers that for these reasons the defendant is not competent because he does not have a sufficient present ability to consult with counsel and lacks a factual understanding of his case.
I credit Dr. Spiers views that the defendant suffers from significant intellectual deficits that manifest themselves in terms of poor performance of tasks requiring verbal comprehension and verbal reasoning. I do not credit his views that the defendant has neurological problems that impair his intellectual functioning because I do not believe that he supplied an adequate basis for those conclusions, and I do not credit his view that the defendant’s poor scores on a battery of instruments used to assess competency means that the defendant is not competent. Finally, while the defendant may have a mental illness (e.g., depression), I do not credit the testimony of Dr. Spiers that as a result of such illness the defendant is not competent.
DISCUSSION
“It has long been the law of this Commonwealth that the trial, conviction or sentencing of a person charged with a criminal offence while he is legally incompetent violates his constitutional rights of due process, whether under the Fourteenth Amendment to the Constitution of the United States or under art. 12 of the Declaration of Rights of the Constitution of this Commonwealth.” Commonwealth v. Hill, 375 Mass. 50, 51-52, 375 N.E.2d 1168 (1978) (quotation and citations omitted). See G.L.c. 123, §15(a) (Court may order an examination at any time to assess competency of a person charged with a criminal offense). When a question arises about whether the defendant in a criminal case is competent, the burden is on the Commonwealth to establish by a preponderance of the evidence that “(1) the defendant has a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding; and (2) the defendant has a rational as well as factual understanding of the proceedings against him.” Commonwealth v. Prater, 420 Mass. 569, 573 (1995). See Drope v. Missouri, 420 U.S. 162, 171 (1975).
Ordinarily, the determination of competency is based on a combination of factors — observations of the defendant’s demeanor and behavior, reports of psychiatric examinations, statements about his condition, and the testimony of expert witnesses. See Commonwealth v. Hill, supra at 54-55. In this case, in addition to the reports of expert witnesses and their testimony at the hearings, the court had the benefit of the testimony of the defendant’s probation officer and the opportunity to observe the defendant in a court room setting.
At a minimum, in order to stand trial, a criminal defendant must understand the charges against him, and have the capacity to communicate with his counsel and to aid in his defense. Commonwealth v. Crowley, 393 Mass. 393, 398 (1984). The issue is not simply whether the defendant has a low or below average IQ as measured by standardized tests, *119 whether there is evidence of organic brain damage or dysfunction, or whether the defendant has a history of alcohol or substance abuse. Rather, it is a combination of a defendant’s present abilities and whether he has a rational and factual understandings of the charges against him.
Dr. Spiers testified that he has used the MacArthur Competence Assessment Tool for 3 years and that it has achieved a level of general acceptance in the community of forensic psychologists. In particular, he testified that it is in widespread use by forensic psychologists, has been endorsed by the American Psychological Association, and has been favorably reviewed in peer reviewed psychological literature.[12] He testified that the test was developed by a team of nationally recognized forensic researchers including Dr. Thomas Grisso, Director of Forensic Training and Research at the University of Massachusetts.
The Commonwealth objected to testimony from Dr. Spiers based on the results of the MCAT test on grounds that the test did not meet the standards for admissibility under Commonwealth v. Lanigan, 419 Mass. 15 (1994). See also Commonwealth v. Robert B, 433 Mass. 453, 458-62 (2001). The Commonwealth was invited to participate in a hearing, but elected not to offer any evidence in the form of live testimony, published reports of scientific research, or psychological or psychiatric literature with respect to the reliability of the MCAT-CA test. In such a case, the court is permitted to consider information from any source in making a determination about the scientific reliability of a psychological test such as the MacArthur Competence Assessment Tool for Criminal Adjudication (MCAT-CA). See Proposed Mass.R.Evid. 104(a).
The testimony of Dr. Spiers, which I credit, is that the MCAT-CA test is in widespread use by forensic psychologists and is regarded by experts in the field as a valid instrument with which to assess aspects of performance and capacity that are relevant to a determination of legal competency. See, e.g., Gary B. Melton, John Petrila, Norman G. Poythress, and Christopher Slobogin, Psychological Evaluations for the Courts 145-50 (2d ed. 1997): P.A. Zapf & R. Roesch, “Mental Competency Evaluations: Guidelines for Judges and Attorneys,” Court Review28-35 (American Judges Association Magazine Summer 2000); R. Otto, N. Poythress, R. Nicholson, J. Edens, J. Monahan, R. Bonnie, S. Hoge and M. Eisenberg, “Psychometric Properties of the MacArthur Competence Assessment Tool-Criminal Adjudication (MacCATCA),” 10 Psychological Assessment 435-43 (1998). On August 21, 1999, Robert Nicholson, Professor of Psychology at the University of Tulsa, presented the results of a two-year investigation funded by the National Institute of Mental Health to the annual convention of the American Psychological Association meeting in Boston. According to professor Nicholson,
This assessment tool- is the first to combine standardized administration, objective scoring, and coverage of competence-related abilities beyond simple understanding of legal proceedings. Our findings also provide the first normative data to help interpret the results of an evaluation. An individual’s performance can be compared to the scores of the 729 subjects in our study. Our results show that the MacCAT-CA is sufficiently reliable and valid to merit clinical use in the conduct of competency evaluations nationwide.
See Remarks of Professor Robert Nicholson, http://www.utulsa.edu/news/articIe.asp?Key=242.
Based on the foregoing, I believe that the MacCATCA competency assessment tool meets the standards of reliability established by Lanigan, supra, and that the testimony of Dr. Spiers about the defendant’s performance on the MCAT test is admissible. However, I do not credit his opinion that due to the defendant’s score, he is not competent. See Canavan's Case, 432 Mass. 304, 314 (2000).
Testimony by qualified psychological or psychiatric expert witnesses that the defendant is not competent does not mandate a finding of incompetency. See Commonwealth v. DeMinico, 408 Mass. 230, 235-36 (1990). See also Commonwealth v. Prater, supra (“The motion judge was not obliged to accept the testimony of other experts who opined that, due to his low IQ and various diagnoses of psychiatric disorders, the defendant was not competent”). See also Commonwealth v. Lamb, 357 Mass. 168, 178 (1970) (Judicial experience with psychiatric testimony suggests that it would be inappropriate to treat an expert’s view as conclusive). In addition, the fact that the defendant may in fact suffer from a mental illness does not mean that he is incompetent. See Commonwealth v. Robbins, 431 Mass. 442, 448-49 (2000).
With respect to the defendant’s present ability to consult with counsel, the question becomes whether he can work cooperatively with counsel, communicate relevant information to counsel, evaluate counsel’s advice, and make decisions about the exercise of his own rights. See Commonwealth v. Monzac, 1997 WL 438770 *6, 7 Mass. L. Rptr. 191 (Superior Court) (1997) (Burnes, J.) (citations omitted). The defendant appears to have an intact memory, an understanding of the charges, an ability to discriminate between truth and falsehood, an ability to relate events to others and to understand the circumstances around him, and an ability to assess relative risks and benefits of his conduct. While his ability to process verbal information and comprehend it is significantly limited, that deficit does not render him incompetent. As in the recent case of Commonwealth v. Wentworth, 53 Mass.App.Ct. 82, 87 (2001), “to some degree this is an unknown.” Special cautions may need to be observed at a trial or plea hearing to assist the defendant in processing information and to avoid overloading the *120 defendant with information. In addition, the court may be required to give defense counsel frequent breaks and extra time to discuss tactical decisions and to obtain necessary directions and agreements from his client.[13] A trial or plea hearing judge also may face special challenges in this case. On balance, however, I find that the defendant has the present ability to assist his attorney with the defense of his case.
With respect to his factual and rational understanding of the proceedings, it is necessary that the defendant understand the specific charges and defenses involved in his case, the process of a trial, the roles of the participants and the consequences of a conviction. The findings based on the testimony of Dr. Oman and Probation Officer Murkison indicate that the defendant understands the factual basis for charges against him, comprehends that they are serious, understands the essential concepts of the trial process, and that a conviction would have serious ramifications for him, and thus does have a factual as well as rational understanding of the charges and the nature of the proceedings.
ORDER
For the above reasons, while the defendant is a person who functions at the low end of the intellectual scale, has a history of severe substance abuse, and is currently on a course of psychoactive medication, I find and rule that at the time of this hearing and on the evidence before me the Commonwealth has established by a preponderance of the evidence that (1) the defendant has a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding; and (2) the defendant has a rational as well as factual understanding of the proceedings against him, and thus that the defendant is competent. A determination that a person is competent, unlike certain other legal issues that arise and are decided prior to trial, does not thereby become the law of the case. The issue of competency may arise again prior to trial or even during the trial. See Commonwealth v. Wentworth, supra at 89. If it does, counsel and the court will be required to address it. See Commonwealth v. Simpson, 428 Mass. 646, 648 n. 1 (1999); Commonwealth v. Crowley, 393 Mass. 393, 402 (1984).

 Alternatively, the court has indicated that a hearing must be conducted whenever there is a “bona fide doubt" about the defendant’s competency. Commonwealth v. Barnes, 399 Mass. 385, 389 (1987), quoting Pate v. Robinson, 383 Mass. 375, 385 (1966).

 Three expert witness reports, two from Dr. Oman and one from Dr. Spiers, were received in evidence and marked as exhibits 1, 2 and 3.

 Dr. Oman added that when the test was originally administered, the defendant was unable to define “yesterday,” but that when he was examined on May 30, 2001, he was able to give an adequate definition.

 There was no evidence offered as to whether the defendant has driven a motor vehicle in recent years nor any evidence about what are the defendant’s reading habits, if any.'

 There was no evidence presented about the precise reasons these were prescribed for the defendant, his prescription drug history, or the current or projected future impact of these prescription drugs on the defendant’s competency or mental health.

 His curriculum vitae was received in evidence and marked exhibit 4.

 There was evidence that the defendant’s mother is severely mentally ill with a history of numerous psychiatric hospitalizations. There is evidence that she is currently under medication for phobias and thought disorders. There also is evidence that his father has a history of depression and alcoholism with psychiatric hospitalization.

 This was described as a condition in which persons become easily intoxicated, experience a severe alteration in their level of consciousness in response to alcohol, lose their judgment and common sense, and often become very aggressive or violent. Exhibit 1, Report of Dr. Spiers at 4.

 See Exhibit 1, Report of Dr. Spiers at 4-5.

 The MacArthur Research Network was created by the John D. and Catherine T. MacArthur Foundation with a grant to the University of Virginia in 1988. According to the Network’s web site, ”[t]he goal of the Research Network on Mental Health and the Law is to build the empirical foundation for the next generation of mental health laws — laws that will assure the rights and safety of individuals and society. The^Network has two overriding mandates: to develop new knowledge about the relationship between mental health and the law, and to turn that understanding into improved tools and criteria for evaluating individuals and making decisions that affect their lives . . . [it] involves experts from the fields of clinical, developmental, and social psychology; sociology; psychiatry; law; and mental health administration and policy. The Network members, in turn, communicate and interact continually with interested groups, including legal and mental health scholars and practitioners, national and state policy-makers and groups such as former mental patients and their family members.” See Http://www.macarthur.virginia.edu/mentalhome.htm.

 No evidence was offered about what other tests were performed to eliminate the potential for malingering or the reliability of such tests.

 According to the publisher of the MacArthur test, Psychological Assessment Resources, Inc., ”[t]he MacCAT-CA is a 22-item structured interview for the pretrial assessment of adjudicative competence. This instrument uses a vignette format and objectively scored questions to standardize the measurement of three competence-related abilities: Understanding (capacity for factual understanding of the legal system and the adjudication process); Reasoning (ability to distinguish more relevant from less relevant factual information and ability to reason about the two legal options: pleading guilty or not guilty); and Appreciation (capacity to understand his or her own legal situation and circumstances).” See Http: / / www.parine.com/product.cfm?ProductID=320.

 The special cautions might require the appointment of additional personnel to assist counsel and the defendant at trial. See Commonwealth v. Wentworth, 53 Mass.App.Ct. 82, 88-89 (2001). Further, the court is mindful that a determination that the defendant is competent does not mean that he will be competent for all time or on any given day. Defense counsel may be obliged to raise the question of competency at a future date. See Commonwealth v. Simpson, 428 Mass. 646, 648 n. 1 (1999). See also Commonwealth v. Wentworth, supra at 89-90.