COMMONWEALTH *vs.* GEORGE F. MCLAUGHLIN.

Suffolk. Norfolk. January 6, 2000. - May 15, 2000.

Present: MARSHALL, C.J., ABRAMS, LYNCH, GREANEY, IRELAND, SPINA, & COWIN, JJ.

*Insanity. Evidence,* Sanity, Presumptions. *Practice, Criminal,* Presumptions
and burden of proof, Verdict, Argument by prosecutor, Instructions to jury,
Sentence. *Burning a Dwelling House. Malice. Due Process of Law,* Sen-
tence. *Statute,* Construction.

Verdicts in a criminal case were not inconsistent where, based on the evidence
presented, the jury could have found that the defendant's mental condition
had abated between the time he killed two coworkers, for which he was
found not guilty by reason of insanity, and the time he returned to his
apartment building and set it on fire, resulting in the death of another
resident in the building, for which he was convicted. [507-509]
At the trial of indictments for manslaughter and arson, testimony of a percipi-
ent witness to the death of a person jumping from the apartment building
the defendant had set on fire was neither inflammatory nor irrelevant. [510]
At a murder trial in which the defendant raised the defense of insanity, the
prosecutor erred egregiously in asking the jury to consider the victims'
rights, in ridiculing the theory of the defense, and in exhorting the jury to
ignore their responsibility under the law; however, his improper statements
were not, in the circumstances, prejudicial, where the judge properly
instructed the jurors to set aside feelings of sympathy, bias, or prejudice
and properly instructed at length on the issue of criminal responsibility,
and where the jury, by acquitting the defendant by reason of insanity of
two charges of murder in the first degree, demonstrated that they were not
distracted from conscientiously reaching their verdicts. [510-512]
At the trial of an arson indictment, the judge's instructions on the element of
malice were erroneous; however, the error created no substantial risk of a
miscarriage of justice, where the only component of malice disputed at
trial was a claim of legal excuse based on the defendant's mental condi-
tion, viz., his asserted lack of criminal responsibility, a defense that the
jury rejected. [512-514]
A criminal defendant, who was found not guilty by reason of insanity on two
counts of murder in the first degree but guilty of an arson and manslaughter
that had followed closely in sequence to the murders, and who was then
committed to Bridgewater State Hospital, was entitled, on the ground of
basic fairness, to serve his sentences while committed to Bridgewater: the
judge was without authority, in the circumstances, to stay execution of the
sentences until the defendant's release from the commitment. [514-520]
SPINA, J., concurring, with whom ABRAMS and LYNCH, JJ., joined, wrote
separately to express the opinion that, prospectively, a criminal defendant

should be required to prove his asserted insanity by a preponderance of the evidence, and that the ruling in *Commonwealth* v. *Keita*, 429 Mass. 843, 849-854 (1999), should be abrogated. [520-534]

INDICTMENTS found and returned in the Superior Court Department on January 5, 1995.

The cases were tried before *Elizabeth Butler*, J.

The Supreme Judicial Court granted an application for direct appellate review.

*Patricia A. O'Neill*, Committee for Public Counsel Services (*Beverly J. Cannone*, Committee for Public Counsel Services, with her) for the defendant.

*Melissa Weisgold Johnsen*, Assistant District Attorney, for the Commonwealth.

SPINA, J. After a jury trial, the defendant, George F. Mc-Laughlin, was found guilty of involuntary manslaughter and arson of a dwelling house and not guilty by reason of insanity of two charges of murder in the first degree. The only issue at trial was whether the defendant was criminally responsible at the time of his acts. The trial judge committed McLaughlin to Bridgewater State Hospital (Bridgewater) and stayed the execution of sentence on his convictions until after his release from Bridgewater. Having granted McLaughlin's application for direct appellate review, we affirm his convictions. We conclude, however, that the judge erred in staying execution of sentence until after McLaughlin's release from commitment.

McLaughlin was not convicted of murder in the first degree. We therefore do not review his appeal pursuant to G. L. c. 278, § 33E. See *Commonwealth* v. *Cullen*, 395 Mass. 225, 228 (1985). A verdict of not guilty by reason of insanity is not a "conviction" within the meaning of § 33E. Cf. *Commonwealth* v. *Doane*, 428 Mass. 631, 631-632 (1999). McLaughlin does not ask us for § 33E review in any event.

1. McLaughlin does not dispute that, shortly after killing Albert Myers and David Wallace at the nursing home where he and they worked, he set a fire in his room that resulted in the death of Cedric Clarke, who resided in the room above Mc-Laughlin's. McLaughlin's sole defense at trial was that he was insane at the time he committed these acts. Once the issue of insanity was raised, the Commonwealth was required to prove beyond a reasonable doubt that McLaughlin was sane (criminally

responsible) when he committed the crimes with which he was charged. See *Commonwealth* v. *Keita*, 429 Mass. 843, 849 (1999). To meet this burden, the Commonwealth was required to show beyond a reasonable doubt either that McLaughlin had no mental disease or defect or that he had the substantial capacity both to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of the law. See *Commonwealth* v. *Goudreau*, 422 Mass. 731, 735 (1996), citing *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547 (1967). McLaughlin argues that the jury's verdict of not guilty by reason of insanity on the murder in the first degree charges requires the same verdict on the other charges. He contends that the judge erred in denying his motion for a required finding of not guilty by reason of insanity. To answer this contention, we must decide whether any rational jury could have come to the four verdicts. See *Commonwealth* v. *Cullen, supra* at 228; *Commonwealth* v. *Lunde*, 390 Mass. 42, 47 (1983).

"[T]he rule is well established in criminal cases that mere inconsistency in verdicts . . . will not render the verdict of guilty erroneous even though such inconsistency may have indicated the possibility of compromise on the part of the jury." *Commonwealth* v. *Sherry*, 386 Mass. 682, 698 (1982), quoting *Commonwealth* v. *Scott*, 355 Mass. 471, 475 (1969). Accordingly, "a defendant may be found not guilty by reason of insanity or impaired mental condition as to one charge, and guilty as to other charges, even where all arise out of the same criminal episode." *People* v. *Bielecki*, 964 P.2d 598, 605 (Colo. Ct. App. 1998). See *Commonwealth* v. *Chandler*, 29 Mass. App. Ct. 571, 580-581 (1990).

We are not persuaded that the verdicts in this case were inconsistent. McLaughlin told police that he undertook to kill Myers and Wallace and one or more residents of his apartment building because he believed they were harming him with high-frequency beams. He carried out the plan against his first two victims, but decided after he got home that he would not kill anyone else. In his own words, he "just couldn't go through with it"; he had "just had enough." Instead, he elected to burn down his apartment. Before leaving the building, he told a fellow tenant about the fire. McLaughlin thought that the building's fire alarm would alert all the tenants to the fire. In light of this evidence, the jury could have found that McLaughlin's mental condition abated by the time he reached his home so that he

was sane, according to the *McHoul* definition of sanity, when he set fire to his apartment. The jury could also have found that they were not satisfied to the same degree of certainty that McLaughlin was sane when he killed Myers and Wallace. These conclusions are not logically contradictory. Cf. *Hotema* v. *United States*, 186 U.S. 413, 421 (1902); *Commonwealth* v. *Rogers*, 7 Met. 500, 502 (1844) (charge to jury by Chief Justice Shaw); *State* v. *Snow*, 513 A.2d 274, 277-278 (Me. 1986). The inferences to be drawn from the evidence were for the jury to make. See *Commonwealth* v. *Kappler*, 416 Mass. 574, 579 & n.4 (1993).[1]

McLaughlin attempts to derail this reasoning by positing that the jury could have reached the two guilty verdicts only by relying on the "presumption of sanity."[2] Relying on the "presumption," he contends, was impermissible in this case because the two not guilty by reason of insanity verdicts necessarily imply that the "presumption" does not apply to McLaughlin. We disagree. The verdicts of not guilty by reason of insanity did not require the jury to disregard the "presumption." The jury could have relied on the "presumption" to reach guilty verdicts on some charges while concluding that it did not allow a finding of criminal responsibility beyond a reasonable doubt as to other charges. See *Commonwealth* v. *Kostka*, 370 Mass. 516, 528-529 (1976) (in Massachusetts, "presumption of sanity" does not disappear from case after evidence of insanity has been introduced).

---

[1]The jury could have inferred sanity "from the facts underlying the crime and evidence of [the defendant's] actions before and after the crime." *Commonwealth* v. *Cullen*, 395 Mass. 225, 229 (1985). See *Commonwealth* v. *Kappler*, 416 Mass. 574, 579 (1993). In particular, the jury could have considered McLaughlin's cooperation with the police as evidence of sanity. See *Commonwealth* v. *Keita*, 429 Mass. 843, 848-849 (1999); *Commonwealth* v. *Johnson*, 422 Mass. 420, 426-427 (1996). The jury could also have rejected in part or in full the uncontroverted testimony of the medical experts who testified at trial that McLaughlin lacked criminal responsibility throughout the evening of the crimes. See *Commonwealth* v. *Kappler, supra*; *Commonwealth* v. *Goulet*, 402 Mass. 299, 307 (1988); *Commonwealth* v. *Chandler*, 29 Mass. App. Ct. 571, 581 (1990).

[2]The judge told the jury that they could consider "the fact . . . that a great majority of people are sane and the resulting probability that any particular man was sane. It is for you, the jury, to draw this inference if you choose." The judge correctly refrained from referring to the "inference" as a presumption within the jury's hearing. See *Commonwealth* v. *Matthews*, 406 Mass. 380, 392 (1990).

2. McLaughlin also argues that the prosecutor prejudiced the case by presenting inflammatory, irrelevant testimony and by rousing the jury in his closing argument. The testimony was of a bystander who witnessed rescuers' attempts to retrieve Clarke from McLaughlin's apartment building using a ladder. Before the rescuers could reach him, Clarke jumped or fell from the window of his apartment, landing on the ground. The witness testified that he put his arm around Clarke and cried at him to hold on to life, and that Clarke held on desperately to his arm for a minute, then relaxed his grip. This evidence was not inflammatory. The prosecutor did not mention it in his closing argument.

The closing argument was nonetheless improper. Near the end of the argument, the prosecutor ridiculed the trial's emphasis on the state of mind of the defendant. Shortly afterward, the judge sustained an objection to the prosecutor's utterances. The prosecutor, however, continued in the same vein. He exhorted the jury to consider the rights of the victims and to do justice for them. He then told the jury that "in the end the truth is that this case is all about whether or not he's guilty. *It's not whether he's insane or not.* The issue for you is whether he's guilty or not guilty. That's the point." (Emphasis added.) He concluded that "[t]he point is, is *that he's guilty because you say so.* And I'm asking you to say so and hold him accountable and hold him responsible" (emphasis added).

The prosecutor erred egregiously in making these statements. He should not have asked the jury to consider the rights of the victims, see *Commonwealth* v. *Barros*, 425 Mass. 572, 581 (1997), or to do justice for them, see *Commonwealth* v. *Drumgold*, 423 Mass. 230, 253 (1996). Nor he should not have exhorted the jury to ignore their responsibility under the law, as he did when he told the jury to declare McLaughlin "guilty because you say so" and to ignore the question of his mental condition. Contrary to the prosecutor's suggestion, the case was "all about" McLaughlin's mental condition. The suggestion therefore could have had the effect only of encouraging the jury to find the defendant guilty even if the evidence did not prove criminal responsibility. See *Commonwealth* v. *Santiago*, 425 Mass. 491, 501 (1997), *S.C.*, 427 Mass. 298 and 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998). The prosecutor should have considered his obligation to argue the Commonwealth's case "in a way that states the evidence clearly and fairly and inspires

confidence that the verdict was reached based on the evidence rather than sympathy." *Id.* at 494. He did not do so.

We evaluate the effect of prosecutors' inflammatory remarks to the jury according to "whether the improper statements . . . 'constituted prejudicial error' " (citation omitted). *Commonwealth* v. *Santiago, supra* at 500.

> The cumulative effect of all the errors in the context of the entire argument . . . and the case as a whole is considered in making this determination. . . . The following factors are considered: whether defense counsel seasonably objected to the arguments at trial; . . . whether the judge's instructions mitigated the error . . . ; whether the errors in the arguments went to the heart of the issues at trial or concerned collateral matters . . . ; whether the jury would be able to sort out the excessive claims made by the prosecutor . . . ; and whether the Commonwealth's case was so overwhelming that the errors did not prejudice the defendant. . . . (Citations omitted.)

*Id.*[3] Three of the factors weigh in favor of the defendant. McLaughlin's counsel made timely objection to the prosecutor's remarks. Some of the most salient remarks were in fact directed to encouraging the jury to ignore the central issue of the trial. The Commonwealth's case as to the defendant's state of mind cannot be said to have been overwhelming.

Consideration of the second and fourth *Santiago* factors, however, allows us to conclude that the remarks were not prejudicial. First, the judge properly instructed the jurors to set aside feelings of sympathy and of bias or prejudice. See *Commonwealth* v. *Gordon*, 422 Mass. 816, 831 (1996). Although she failed to instruct the jury that a closing argument is not evidence, the effects of this omission were mitigated when the judge told the jurors that "your collective memory of the facts . . . will govern." More importantly, the judge properly instructed the jurors at length about the question of criminal responsibility. These instructions countered the prosecutor's attempt to distract the jury's attention from this crucial issue. Second, the verdicts

---

[3]"While *Commonwealth* v. *Santiago*[, 425 Mass. 491 (1997), *S.C.*, 427 Mass. 298 and 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998),] was decided after the trial in this case, the factors to be considered were all set forth in cases before this trial." *Commonwealth* v. *Rock*, 429 Mass. 609, 616 n.9 (1999).

show that the jury were able to distinguish wheat from chaff. We ordinarily assume that jurors are reasonably sophisticated and capable of sorting out hyperbole and speculation. See *Commonwealth* v. *Marquetty*, 416 Mass. 445, 451 (1993). See also *Commonwealth* v. *Rock*, 429 Mass. 609, 616 (1999), quoting *Commonwealth* v. *Kozec*, 399 Mass. 514, 517 (1987). The verdicts bear out this assumption. By acquitting McLaughlin by reason of insanity of the two most serious charges against him, the jury eloquently demonstrated that they had done their duty. See *Commonwealth* v. *Rock, supra* at 616; *Commonwealth* v. *Gordon, supra* at 831.

3. McLaughlin argues that the judge improperly instructed the jury on the elements of arson of a dwelling house, G. L. c. 266, § 1. The judge correctly told the jury that the Commonwealth must prove that the defendant wilfully and maliciously set fire to his apartment. See *Commonwealth* v. *Cooper*, 264 Mass. 378, 380 (1928). She then said that "malice used in this context of arson is not the same as malice used in a murder charge. It's used in the sense of improper, selfish motive. But there need not be any specific [*sic*] to kill or any specific intent to do grievous bodily harm, or indeed, any specific intent to do an act that will result in death." The judge also said that "[t]he use of both wilful and malicious in the statute does not indicate that malice has a meaning different from its ordinary meaning. Malice . . . in the crime of arson need not be overtly expressed. It may be inferred, jurors, from the wilful act of burning without legal justification." Because no objection was made to this instruction at trial, we review the instruction for whether any errors created a substantial risk of a miscarriage of justice. See, e.g., *Commonwealth* v. *Ely*, 388 Mass. 69, 74 (1983).

The trial judge in this case deviated in a number of respects from the instruction on the malice element of arson approved in *Commonwealth* v. *Niziolek*, 380 Mass. 513 (1980): "malice 'characterizes all acts done with an evil disposition, a wrong and unlawful motive or purpose; the wilful doing of an injurious act without lawful excuse.' " *Id.* at 527, quoting *Commonwealth* v. *York*, 9 Met. 93, 104 (1845).[4] First, she invited the jury to "infer[]" malice without having defined the term. See

---

[4]The judge may well have been relying on jury instructions endorsed by the Superior Court. See 1 Massachusetts Superior Court Criminal Practice Jury Instructions § 2.32.1 (Arson [I]) (Massachusetts Continuing Legal Educ.

*Commonwealth* v. *Niziolek, supra.* Second, she implied that the meaning of the malice element of arson is identical to the ordinary meaning of the word "malice." See *Commonwealth* v. *Lamothe,* 343 Mass. 417, 419 (1961), quoting *State* v. *Pisano,* 107 Conn. 630, 632 (1928); *Commonwealth* v. *York, supra.* Third, she described malice as "used in the sense of improper, selfish motive," rather than "wrong and unlawful motive or purpose." Fourth, she used the phrase "legal justification" instead of "legal [or lawful] excuse."[5]

The malice instruction was erroneous. It nonetheless created no substantial risk of a miscarriage of justice. The defendant concedes on appeal that he acted wilfully (i.e., intentionally, see *Commonwealth* v. *Luna,* 418 Mass. 749, 753 [1994], quoting *Commonwealth* v. *Welansky,* 316 Mass. 383, 397 [1944]) in setting the fire and that his act was unlawful. Because wilfulness and the commission of an unlawful act are two of the three components of malice in arson, the only component that the defendant has not conceded is the lack of justification or excuse for his actions.[6] The only claim of excuse or justification that

1999), quoting "chargebook offered as a guide to Superior Court judges in 1995." The official notes to these instructions appear to misread *Commonwealth* v. *Ely,* 388 Mass. 69, 74 (1983), where we held that similar arson instructions did not create a substantial risk of a miscarriage of justice. To say this was not to approve the instructions. *Commonwealth* v. *DeCicco,* 44 Mass. App. Ct. 111, 117 (1998), should not be read to imply that we did approve the *Ely* instructions.

[5]Excuse is a broader category than justification. As the trial judge indicated when she instructed the jury on murder in the first degree, an act can be legally excused even if it is not legally justified. Cf. *Commonwealth* v. *Puleio,* 394 Mass. 101, 110-111 (1985) (Nolan, J., dissenting). The judge told the jury that a killing done in war would be a justified killing and that a killing done in self-defense would be an excused killing.

[6]That malice in arson comprises only three components is clear from *Commonwealth* v. *Goodwin,* 122 Mass. 19, 35 (1877), where the court stated that "[t]he wilful doing of an unlawful act without excuse is ordinarily sufficient to support the allegation that it was done maliciously and with criminal intent." Accord *Commonwealth* v. *Williams,* 110 Mass. 401, 403 (1872).

As the Appeals Court explained in *Commonwealth* v. *Mezzanotti,* 26 Mass. App. Ct. 522, 528-529 & n.5 (1988), our description of malice in *Commonwealth* v. *Goodwin, supra,* fleshes out the meaning of the malice formulation approved in *Commonwealth* v. *Niziolek,* 380 Mass. 513 (1980). See *id.* at 527, citing *Commonwealth* v. *Goodwin, supra* at 35; *Commonwealth* v. *Lamothe,* 343 Mass. 417, 420 (1961) (quoting *Goodwin* formulation); J.R. Nolan & B.R. Henry, Criminal Law § 424, at 320 (2d ed. 1988) (same). The three components of the *Goodwin* formulation are in substance the same as the

McLaughlin raised at trial related to his mental condition.[7] No other issue was disputed at trial. See *Commonwealth* v. *Gabbidon*, 398 Mass. 1, 5 (1986); *Commonwealth* v. *Ely, supra* at 74; *Commonwealth* v. *Glenn*, 23 Mass. App. Ct. 440, 444 (1987). The judge's instructions made clear the Commonwealth's burden as to criminal responsibility. By declaring McLaughlin guilty of arson, the jury necessarily rejected his only defense of excuse or justification.[8]

4. The judge sentenced McLaughlin to from nineteen to twenty years in prison on the involuntary manslaughter conviction and to from eight to ten years on the arson conviction, the sentences to run consecutively. She stayed execution of the sentences until the date of his release from his civil commitment. McLaughlin argues that the stay exceeded the judge's authority and violated his constitutional rights. The Commonwealth argues that the judge had the discretion to defer the sentences until McLaughlin's release from commitment. Without reaching any constitutional questions, we hold that the stay was unwarranted.

As the Commonwealth concedes, McLaughlin is entitled to credit toward his sentences for the two years he spent confined in jail and in Bridgewater State Hospital between late 1994,

---

components of the second half of the *Niziolek* formulation (the part that follows the semicolon). The first half of the *Niziolek* formulation (the part that precedes the semicolon) is, strictly speaking, surplusage that serves only to round out the meaning of the second half. See *Commonwealth* v. *DeCicco*, 44 Mass. App. Ct. 111, 117 (1998); *Commonwealth* v. *Mezzanotti, supra* at 529 n.5.

Put otherwise, "an act done with an evil disposition, a wrong and unlawful motive or purpose" is essentially synonymous, at least in arson cases, with "the wilful doing of an injurious act without lawful excuse."

[7]The category of justification or excuse includes, among other things, accident, mistake, self-defense, and defense of another. See *Commonwealth* v. *Medina*, 430 Mass. 800, 804-805 n.5 (2000); *Commonwealth* v. *Mezzanotti, supra* at 528.

[8]It might be argued that mental condition can be an "excuse" even when the condition does not rise to the level of insanity. We think such an argument must fail. As the judge told the jury, a defendant's mental disease or defect short of insanity is relevant to whether the defendant was capable of forming the intent needed to commit a particular crime. Once such an intent has been proved, however, mental disease or defect short of insanity is not an "excuse" for the defendant's conduct. See *Commonwealth* v. *Meinholz*, 420 Mass. 633, 637 (1995) (approving jury charge stating that, if defendant's specific intent had been proven beyond a reasonable doubt, "the defendant's mental impairment, if any, does not excuse or justify his actions").

when the crimes occurred, and early 1997, when the sentences were imposed. See *Stearns, petitioner,* 343 Mass. 53 (1961); G. L. c. 127, § 129B; G. L. c. 279, § 33A. See also *Commonwealth* v. *Milton,* 427 Mass. 18, 23-24 (1998). Similarly, "[i]f he [had been] committed to the hospital after he had started to serve his sentence his time there spent would be credited on his sentence." *Stearns, petitioner, supra* at 56. See G. L. c. 123, § 18 (*c*); G. L. c. 123, § 15 (*e*). Cf. G. L. c. 127, § 119 (same for confinements in medical facilities); *Commonwealth* v. *Godfroy,* 420 Mass. 561, 567-568 (1995) (awarding sentencing credit for time served at treatment center for sexually dangerous persons). The Commonwealth's argument therefore could apply only to persons who are committed to a facility for the care and treatment of the mentally ill between trial and execution of sentence, not to persons committed before trial or while serving a sentence. To allow the denial of credit because of this fortuity would create an anomaly raising questions of basic fairness.

If McLaughlin is eventually cured of mental illness, then whether his sentences have been stayed will determine the date of his eventual release. Persons who are committed for mental illness while serving their sentences and are cured before the end of the term of their sentences, however, would assuredly be entitled to leave prison by the end of such term. It seems odd at minimum that McLaughlin but not these others should face the possibility of additional decades in prison after his release from Bridgewater. A statutory scheme that permitted outcomes of this sort would raise difficult questions of due process and equal protection. See *Foucha* v. *Louisiana,* 504 U.S. 71 (1992); *Jones* v. *United States,* 463 U.S. 354, 369 & n.18 (1983) (persons found not guilty by reason of insanity on criminal charges may not be punished for acts with which they were charged); *Commonwealth* v. *LeBlanc,* 370 Mass. 217, 221 (1976); *White* v. *Pearlman,* 42 F.2d 788, 789 (10th Cir. 1930).

"Although fairness is the concept underlying due process, our decisions in this area have not rested on constitutional requirements. Where no statute controls, we have been establishing guiding principles, case by case." *Chalifoux* v. *Commissioner of Correction,* 375 Mass. 424, 428 (1978). See *Lewis* v. *Commonwealth,* 329 Mass. 445, 448 (1952). We do not favor "overly technical" readings of relevant statutes; rather, we read them "against the backdrop of fair treatment of the prisoner." *Commonwealth* v. *Grant,* 366 Mass. 272, 275 (1974). See *Com-*

*monwealth* v. *Beauchamp,* 413 Mass. 60, 62-63 (1992), and cases cited. See also *Manning* v. *Superintendent, Mass. Correctional Inst., Norfolk,* 372 Mass. 387, 392 (1977).

The parties point us to no statute or rule, nor can we find any, authorizing or forbidding judges to stay the execution of a defendant's sentence until his release from commitment for mental illness. Stay of execution of sentence is allowed in certain other circumstances, but these are not relevant to this case.

Rule 31 (a) of the Massachusetts Rules of Criminal Procedure, 378 Mass. 902 (1979), offers us some guidance. That provision "confers discretionary power to stay the execution of sentence pending appeal." *Commonwealth* v. *Allen,* 378 Mass. 489, 496 (1979).[9] Rule 31 is directly derived from the version of G. L. c. 279, § 4, that was in effect prior to an amendment that coincided with the enactment of the rules. See Reporters' Notes to Mass R. Crim. P. 31, Mass. Ann. Laws, Rules of Criminal Procedure at 313 (Lexis 1997).

In *Commonwealth* v. *Hayes,* 170 Mass. 16 (1897), the court held that St. 1895, c. 469, an early version of G. L. c. 279, § 4, granted trial judges only limited power to stay execution of sentence. The defendant had moved for stay of execution of sentence following an unsuccessful appeal. The ground for the motion was the defendant's poor health. Writing for the court, then Justice Holmes said that the trial judge lacked the authority to grant a stay in such circumstances. First, the defendant's motion did not fall within what were then the terms of the statute. See *id.* at 16-17. Second, even if the motion could be regarded as a motion for a stay to be granted on authority other than that accorded by the statute, "[t]he term in which the sentence was pronounced was past, and the power of the court to modify it was at an end." *Id.* at 17. In 1897, criminal terms were abolished by statute, rendering irrelevant this basis for the holding in *Hayes.* See *Commonwealth* v. *O'Brien,* 175 Mass. 37, 39 (1899). See also *District Attorney for the N. Dist.* v. *Superior Court,* 342 Mass. 119, 122 (1961). Left untouched, however, was the

---

[9]"If a sentence of imprisonment is imposed upon conviction of a crime, the entry of an appeal shall not stay the execution of the sentence unless the judge imposing it or a judge of the Supreme Judicial Court or the Appeals Court determines in his discretion that execution of said sentence shall be stayed pending the final determination of the appeal." Mass R. Crim. P. 31 (a), 378 Mass. 902 (1979).

court's statement that "[a]n ordinary sentence of fine or imprisonment imports that it is to be carried into execution forthwith." *Commonwealth* v. *Hayes, supra* at 17. The court quoted from a precursor of G. L. c. 279, § 34, which provided (as § 34 now provides) that when a defendant is sentenced to imprisonment or a fine, the clerk of the court shall "as soon as may be" (for which the current version of § 34 substitutes "forthwith") deliver to the sheriff or to another court officer a court transcript authorizing the officer to execute the sentence, and that the officer "shall execute it accordingly." See *Weiner* v. *Wentworth*, 181 Mass. 15, 17 (1902). In *Commonwealth* v. *O'Brien, supra* at 39, the court said that *Hayes* "implies that, under the statute, the power of the court after exceptions are overruled to vacate the order staying the sentence, and to order the sentence executed, does not extend so far as to permit a further stay of the sentence on independent grounds not affecting the legality or propriety of the conviction."[10]

When the Legislature codified what is now G. L. c. 279, § 4, within the Revised Laws of 1902, no substantive changes were made to the statute. Compare St. 1895, c. 469, with R.L. 220, § 3 (1902). Subsequent amendments to what is now G. L. c. 279, § 4, including those attendant on the promulgation of Mass. R. Crim. P. 31, have largely left unchanged the authority of judges to grant stays.[11] That is a strong indication that trial judges lack authority to stay execution of sentence "on independent grounds not affecting the legality or propriety of the conviction." *Commonwealth* v. *O'Brien, supra.* To the extent that the former G. L. c. 279, § 4, was at all ambiguous, the rule that penal enactments are to be construed strictly in favor of the defendant, see, e.g., *Commonwealth* v. *Keniston*, 5 Pick. 420

---

[10]The court held in *Commonwealth* v. *O'Brien*, 175 Mass. 37, 39-40 (1899), that the power of courts as to sentencing "impliedly includes the power to correct any illegality or error in a sentence, provided it then remains wholly unexecuted." The court said that *Hayes* did not conflict with this holding. See *Commonwealth* v. *O'Brien, supra* at 39. In *Commonwealth* v. *Lobel*, 187 Mass. 288 (1905), the power to correct illegality or error in a sentence was explicitly held to extend to the correction of errors of fact as well as of law. The court said in *Lobel* that *Hayes* had been "limited to the precise point decided in it," but not that it had been overruled or that its reasoning was questionable. *Commonwealth* v. *Lobel, supra* at 289.

[11]Certain amendments to R.L. 220, § 3 (1902), now G. L. c. 279, § 4, modified the authority of judges to grant stays when an appeal was pending or when a defendant had been convicted of a crime punishable by death. These modifications are not relevant to this case.

(1827), would have counseled against construing the statute to permit execution of sentence to be stayed in order to extend the period of a defendant's confinement. The same considerations would lead us to construe rule 31 (a) not to authorize stay of execution of sentence for this purpose. But we need not resort to any canon of interpretation in order to arrive at this conclusion. The language of the rule is plain on its face. The rule does not authorize a judge to stay execution of a penal sentence when an appeal is not pending.[12]

It might be argued that the stay in this case was valid because it was an exercise of a trial judge's inherent power to stay execution of sentence after it is pronounced. Other jurisdictions are in disagreement as to the reach of this power. See *King* v. *Commonwealth*, 246 Mass. 57, 58-59 (1923), citing, inter alia, *Ex parte U.S., petitioner*, 242 U.S. 27, 48 n.1 (1916). A few jurisdictions appear to have approved of the practice of delaying execution of a sentence of incarceration until after the defendant's release from commitment for mental illness. See, e.g., *Talley* v. *Beavers*, 141 Ga. 110, 112 (1913). Cf. *State* v. *Brown*, 12 Ohio St. 3d 147, 151 (1984). The English common law, however, appears to have allowed stays of execution of sentence only in a few classes of cases, all of them cases in which the stay was a true reprieve, rather than a means of extending the duration of the defendant's confinement. See *Ex parte U.S., petitioner, supra* at 42-45 (quoting Hale and Blackstone). This evidence counsels against an expansive reading of judicial powers that would allow stays of execution of sentence for punitive purposes. See *Crocker* v. *Justices of the Superior Court*, 208 Mass. 162, 166 (1911), quoting *Commonwealth* v. *Knowlton*, 2 Mass. 530, 534 (1807).

Our own cases are largely silent on the question of the inherent power of trial judges to stay execution of sentence. Our decision in *Commonwealth* v. *Hayes, supra*, to the extent that it speaks at all of the inherent power of courts to issue stays, indicates that this power is limited. Other than this, very little has been said. See *Commonwealth* v. *Glines*, 40 Mass. App. Ct. 95, 97 n.2 (1996) ("Ordinarily, a judge would employ a stay

---

[12]It would appear that the only other provisions of statutes or rules that authorize stay of execution in any circumstances are Mass. R. Crim. P. 43 (b), 378 Mass. 919 (1979), and Rules 7 (e) and 9 (c) of the District Court Rules for Probation Violation Proceedings (adopted Dec. 2, 1999, effective Jan. 3, 2000). None of these provisions is relevant to this case.

only to allow a convicted person to arrange his or her affairs, or
. . . pending determination of an appeal"); *Commonwealth* v.
*DeMarco*, 387 Mass. 481, 482 (1982) (noting that trial judge
stayed execution of sentence for one week to enable defendant
to see his parents).[13]

We have found only one reported case in Massachusetts in
which the trial judge stayed execution of sentence during a
defendant's commitment for mental illness. In *Commonwealth*
v. *Foley*, 17 Mass. App. Ct. 238 (1983), overruled on other
grounds, *Commonwealth* v. *Amirault*, 415 Mass. 112, 117 n.9
(1993), the defendant was committed for six months to Bridge-
water State Hospital after being convicted of rape of a child and
assault. The trial judge stayed execution of the defendant's
sentences until the end of the commitment to Bridgewater. The
judge indicated that any time spent at Bridgewater after the
expiration of the six months would be counted against the
defendant's sentences. See *id.* at 240-241, 245. The Appeals
Court rejected the defendant's claim that he should be given
credit for the initial six months spent in Bridgewater. The court
said that "the period of commitment, when added to the length
of sentence, did not exceed the maximum sentence which the
judge could legally have imposed." *Id.* at 245. It could be
inferred, though it is arguable, that the Appeals Court thought
that the trial judge included the six months at Bridgewater in
his calculation of the proper sentence for the defendant. We
think in any case that a trial judge should not use his or her
power to stay execution of sentence in order to lengthen the
defendant's confinement beyond the period announced by the
judge in imposing sentence. To the extent that *Foley* says
otherwise, it is overruled.[14]

We need not delineate in detail the contours of trial judges'

---

[13]We held in *Commonwealth* v. *Yameen*, 401 Mass. 331, 335 (1987), cert.
denied, 486 U.S. 1008 (1988), that trial judges in their discretion may stay
execution of a driver's license revocation pending appeal. We did not say
whether this discretionary power was inherent or somehow conferred by
statute. We did say that the power was not conferred by Mass. R. Crim. P. 31.
See *id.* at 334. *Yameen* offers no guidance on the question of stays not granted
pending an appeal.

[14]The sentencing disposition approved in *Commonwealth* v. *Foley*, 17 Mass.
App. Ct. 238 (1983), would be impermissible today even apart from our hold-
ing as to the scope of trial judges' power to stay execution of sentence.
General Laws c. 123, § 15 (*e*), as amended through St. 1996, c. 266, provides
that a person who is committed to Bridgewater State Hospital after being

inherent power to stay execution of sentence. We may say, however, that normally this power should be exercised only with the consent of the defendant and for short periods of time. See *Commonwealth* v. *Glines, supra* at 97 n.2. See also *United States* v. *Melody*, 863 F.2d 499, 501-502 (7th Cir. 1988) (rejecting defendant's challenge to stay of execution of sentence pending her husband's release from prison where purpose of stay was to ensure that defendant's children had one parent at home at all times and where defendant had not objected to stay at time of sentencing). The basic rule is clear. "Sentences are to be executed forthwith unless suspended or stayed for the exceptional reasons permitted by law." *Mariano* v. *Judge of Dist. Court of Cent. Berkshire*, 243 Mass. 90, 92 (1922), citing, inter alia, G. L. c. 279, § 34; *Commonwealth* v. *Hayes, supra*; *Weiner* v. *Wentworth*, 181 Mass. 15 (1902). No such exceptional reasons appear from the record. McLaughlin's sentences therefore must be deemed to have begun running when the trial judge imposed sentence, with credit for the time he was held awaiting trial. When viewed in light of the statutory scheme for awarding credit to prisoners for time spent confined in institutions for the mentally ill, this disposition conforms with "considerations of fairness and a proper sense of justice" and avoids the potential for violation of due process and equal protection principles. *Chalifoux* v. *Commissioner of Correction*, 375 Mass. 424, 427 (1978). See *Zullo, petitioner*, 420 Mass. 872, 876 (1995). Cf. *Commonwealth* v. *Hayes, supra* at 17.

The judgments of conviction are affirmed. The stay of execution of sentence is vacated. The defendant's first sentence shall be deemed to have commenced on January 24, 1997, the date when the trial judge initially imposed sentence.

*So ordered.*

SPINA, J. (concurring, with whom Abrams and Lynch, JJ., join). I would hold that in cases to be tried after today, the burden will be on a criminal defendant to prove his insanity by a preponderance of the evidence. I would abandon our practice, which we approved by divided vote in *Commonwealth* v. *Keita*, 429 Mass. 843 (1999), of stating simultaneously that the Com-

---

found guilty on a criminal charge and prior to sentencing must have the time he spends in Bridgewater credited against his sentence.

monwealth has the burden of proving a defendant's sanity beyond a reasonable doubt and that the jury may rely, in determining whether the Commonwealth has met that burden, on what we have called the "presumption of sanity."

The defendant's argument as to the alleged inconsistency of the verdicts reflects a misunderstanding of our law of criminal responsibility that some of the language used in our prior cases may have encouraged. We have repeatedly said that the Commonwealth has the burden of proving a defendant's sanity beyond a reasonable doubt once the issue is raised. We have also said that a jury may rely, in determining whether the Commonwealth has met its burden, on what we have called the "presumption of sanity." These statements are not easy to reconcile. The juxtaposition of the statements may lead jurors to conclude that the reasonable doubt standard, as applied to potentially insane defendants, means something less than what we have clearly said it means in all other contexts.

We recently quoted, with apparent approval, our statement in *Commonwealth* v. *Clark*, 292 Mass. 409, 415 (1935), that "the fact that a great majority of men are sane, and the probability that any particular man is sane, may be deemed by a jury to outweigh, in evidential value, testimony that he is insane." *Commonwealth* v. *Keita*, *supra* at 847.[1] The statement implies that the "presumption" by itself may outweigh affirmative evidence of insanity. We recited evidence of sanity in *Keita* that we described as "thin" yet said was sufficient along with the presumption to justify not ordering a new trial in that case. *Id.* at 849. See *Commonwealth* v. *Mutina*, 366 Mass. 810, 815 n.2 (1975) ("there are decisions of this court which allow the 'presumption' alone to carry the prosecution's burden"); *Walker* v. *Butterworth*, 599 F.2d 1074, 1077 (1st Cir.), cert. denied, 444 U.S. 937 (1979).

This case is but the most recent one in which we have invoked the "presumption" to uphold convictions on appeal despite evidence that could otherwise cause reasonable jurors

---

[1]We said in *Commonwealth* v. *Clark*, 292 Mass. 409, 415 (1935), that "the form of expression may be criticised on the ground that in truth it is not . . . the presumption of sanity that may be weighed as evidence, but rather the rational probability on which the presumption rests." We did not quote this statement in *Commonwealth* v. *Keita*, 429 Mass. 843 (1999).

significant doubts as to the sanity of defendants.[2] On a literal application of the reasonable doubt standard as that standard has been articulated in other contexts, McLaughlin would have at minimum a strong argument to be entitled, absent the application of the "presumption of sanity," to required findings of not guilty by reason of insanity on both his convictions. What easily saves the convictions is the "presumption."

The "presumption of sanity," we have said, is not really a presumption. Nor is it exactly an inference. Rather, the "presumption" "shares, but is not limited to, the characteristics of both presumptions and inferences." *Commonwealth* v. *Kostka*, 370 Mass. 516, 531 (1976).[3] Jurors may infer a defendant's sanity, we have said, "from their common knowledge of the fact that a great majority of men are sane, and of the probability that any particular man is sane. It is for the jury to decide in each case whether they draw that inference." *Commonwealth* v. *Keita, supra* at 847, quoting *Commonwealth* v. *Smith*, 357 Mass. 168, 180 (1970).

Our attempts to explain the "presumption" have not been entirely pellucid. We have said that the "presumption" "oper-

---

[2]As Chief Justice Wilkins noted in *Commonwealth* v. *Keita, supra*, we have occasionally reached a different result when exercising our special power to review convictions pursuant to G. L. c. 278, § 33E. In a few such instances, concerns about the weight of the evidence of sanity have prompted us to order a new trial. See *id.* at 847-848, and cases cited.

[3]We have said that we use the term "presumption" (usually in quotation marks) not because we think it is strictly accurate, but "in order to relate our discussion to other jurisdictions and to various texts." *Commonwealth* v. *Kostka*, 370 Mass. 516, 525 n.5 (1976). Cf. *Commonwealth* v. *Keita, supra* at 846. Some jurisdictions use the term quite differently than we have. Among these are jurisdictions that employ the "presumption" only to assign to the defendant the initial burden of producing evidence of insanity. In these jurisdictions, "after a certain quantum of evidence tending to show insanity has been introduced, the presumption loses all effect." *Commonwealth* v. *Kostka, supra* at 528. See 2 McCormick, Evidence § 336, at 409 n.2 (5th ed. 1999); 9 J. Wigmore, Evidence § 2501, at 464 (Chadbourn rev. ed. 1981 & 1999 Supp.). In Massachusetts, by contrast, the "presumption of sanity" retains evidential value even after evidence of insanity has been raised by the defendant. See *Commonwealth* v. *Kostka, supra* at 528-529; *Commonwealth* v. *Smith*, 357 Mass. 168, 179-180 (1970).

Every jurisdiction, it seems, requires the defendant at least to shoulder the initial burden of producing evidence of insanity. "Were it otherwise, the prosecution would be confronted with the intolerable burden of establishing the defendant's sanity in every criminal case." 1 W.R. LaFave & A.W. Scott, Jr., Substantive Criminal Law § 4.5(e), at 499 (1986).

ates procedurally while the facts underlying it operate substantively"; that "the facts underlying the presumption and the inference that may be drawn from those facts provide a basis for the jury to determine that the defendant was sane beyond a reasonable doubt at the time the crime was committed"; and that "it is not the presumption itself that is weighed as evidence; rather, the jury weigh the facts underlying the presumption and the inferences that may follow from those facts." *Commonwealth* v. *Kostka, supra* at 530-531. Yet we have also said that the trier of fact may "consider" the "presumption" "as evidence." *Commonwealth* v. *Keita, supra* at 846. See *Commonwealth* v. *Kappler,* 416 Mass. 574, 583 (1993). Cf. *Commonwealth* v. *Masskow,* 362 Mass. 662, 671 (1972) ("an instruction to the jury to weigh the presumption [of sanity] may be confusing and is therefore undesirable"). Despite the obvious analytic problem of reconciling the reasonable doubt standard with a "presumption" that permits jurors to "infer" a particular defendant's sanity from general probabilities, see, e.g., Eule, The Presumption of Sanity: Bursting the Bubble, 25 UCLA L. Rev. 637, 698 (1978), we have afforded jurors little if any guidance on how to decide in a particular case whether to rely on the "presumption" to draw an inference of sanity. Cf. *Commonwealth* v. *Kappler, supra* at 599 (O'Connor, J., dissenting) ("The fact that a great majority of people are sane says little, if anything, about whether a particular defendant was sane when he or she engaged in a type of conduct in which the great majority of people do not engage").

In *Commonwealth* v. *Keita,* a majority of the Justices of this court acknowledged the difficulties in our formulation as to the burden of proof on sanity but declined to abandon it. Writing for the court, Chief Justice Wilkins noted that thirty-eight jurisdictions currently place the burden on the defendant to prove his sanity. See *id.* at 850.[4] He noted also that our formulation is logically inconsistent with the "presumption," *id.* at 846, and that the inconsistency results in "unavoidably complicated"

---

[4]A few jurisdictions have eliminated the insanity defense altogether. In these jurisdictions, evidence of mental condition remains admissible as relevant to the mental state of the defendant when this is an element of a crime of which he is accused. See *Commonwealth* v. *Keita, supra* at 850-851 n.6. See also 2 P.H. Robinson, Criminal Law Defenses § 173(a), at 282-283 & n.5 (1984 & 1999 Supp.).

jury instructions. *Id.* at 850. He conceded that a jury would find it "easier" to understand instructions to the effect that a defendant must prove his insanity by a preponderance of the evidence. *Id.*

Chief Justice Wilkins nonetheless concluded that the current formulation should be retained. His reasons were as follows. First, in light of our long-standing tradition of requiring the prosecution to prove sanity beyond a reasonable doubt, "[t]here is no theoretical justification for maintaining a lower standard for the proof of sanity than for the proof of guilt." *Id.* at 853. Second, the Legislature has not taken the opportunity to reject the formulation, despite having had almost one hundred years in which to do so. *Id.* at 853-854. Third, the preponderance standard would also create potentially contradictory, and confusing, burdens. In a case in which mens rea, as an element of a crime, and criminal responsibility are both at issue, the jury would need to be instructed carefully in order to avoid the hazard of convicting a defendant on less than evidence beyond a reasonable doubt of the mens rea element. See *id.* at 852-853, citing *People* v. *Kohl*, 72 N.Y.2d 191 (1988). Fourth, the current formulation does not result in verdicts of not guilty by reason of insanity for many defendants. See *Commonwealth* v. *Keita, supra* at 853-854.

Justice Abrams disagreed with Chief Justice Wilkins's conclusion. Joined by Justice Lynch, she wrote that the defendant should be required to show the absence of criminal responsibility by a preponderance of the evidence. Such an allocation of the burden of proof, she said, "accords with the life experience of those persons called as jurors." *Id.* at 854 (Abrams, J., concurring in part and dissenting in part). Conjoining a reasonable doubt instruction with an instruction on the "presumption of sanity," she said, "diminishes the concept of the reasonable doubt standard." *Id.* at 855.

Having considered the arguments made in *Commonwealth* v. *Keita*, I am persuaded, despite Chief Justice Wilkins's reservations, that the preponderance formulation is to be preferred. I also think that the use of the "presumption of sanity" should be discontinued. I consider his reservations in turn.

First, I think that proof of sanity is distinguishable from proof of guilt because sanity is not an element of an offense. Lack of criminal responsibility has been traditionally considered an affirmative defense to charges of crime. No doubt this is in

part because of a basic postulate of our criminal law: the principle that adult men and women are presumed to be responsible for what they do. See, e.g., *Commonwealth* v. *Webster*, 5 Cush. 295, 305 (1850). Our society's intuitive adherence to that principle accounts for why defendants ordinarily are not considered "innocent" of criminal responsibility "until proved guilty." See *Commonwealth* v. *Keita, supra* at 854 (Abrams, J., concurring in part and dissenting in part).

As Chief Justice Wilkins acknowledged in *Commonwealth* v. *Keita, supra* at 851-852, the Federal Constitution does not forbid placing the burden on the defendant to prove an insanity defense. See *Martin* v. *Ohio*, 480 U.S. 228, 236 (1987), citing *Leland* v. *Oregon*, 343 U.S. 790 (1952); *Jones* v. *United States*, 463 U.S. 354, 368 n.17 (1983); *Patterson* v. *New York*, 432 U.S. 197, 201-202 (1977); *Commonwealth* v. *Kappler, supra* at 577-578 n.2, 586 n.11; *United States* v. *Pryor*, 960 F.2d 1, 3 (1st Cir. 1992); *Walker* v. *Butterworth*, 599 F.2d 1074, 1080 (1st Cir. 1979). Cf. *Commonwealth* v. *Kostka, supra* at 525-537 ("presumption of sanity," as used in Massachusetts, does not violate due process).[5] Compare *Mullaney* v. *Wilbur*, 421 U.S. 684 (1975); *In re Winship*, 397 U.S. 358 (1970). Indeed, the Supreme Court has not even "said that the Constitution requires the States to recognize the insanity defense." *Medina* v. *California*, 505 U.S. 437, 449 (1992), citing *Powell* v. *Texas*, 392 U.S. 514, 536-537 (1968).

It was argued in *Commonwealth* v. *Keita, supra*, that art. 12 of the Commonwealth's Declaration of Rights should be construed to put more stringent limits on the allocation of burdens as to sanity than does the Federal Constitution. Because adopting a preponderance formulation would do little if anything to shift the actual burden of proof as to sanity, it is unlikely that this argument would be successful. See *Commonwealth* v. *Kappler, supra* at 586 ("presumption of sanity" does not violate Declaration of Rights). Requiring a criminal defendant to prove

---

[5]The statute upheld in *Leland* v. *Oregon*, 343 U.S. 790 (1952), required the defendant to prove his insanity beyond a reasonable doubt. In *Davis* v. *United States*, 160 U.S. 469 (1895), the Supreme Court had held that in Federal prosecutions the government must prove the defendant's sanity beyond a reasonable doubt. The Court had nonetheless said that the prosecution could rely on a "presumption" of sanity in meeting its burden. See *id.* at 486-488. The Court said in *Leland* that *Davis* "obviously establishes no constitutional doctrine, but only the rule to be followed in [F]ederal courts." *Leland* v. *Oregon, supra* at 797.

his lack of sanity by a preponderance of the evidence does not "offend some principle of justice so rooted in the tradition and conscience of our people as to be ranked fundamental." *Trigones* v. *Attorney Gen.*, 420 Mass. 859, 863 (1995), quoting *Medina* v. *California*, 505 U.S. 437, 445-446 (1992). Our practice of stating that the Commonwealth must prove the sanity of the defendant beyond a reasonable doubt is of relatively recent origin.

At common law, the burden of proving all affirmative defenses — whether of "justification, excuse or alleviation" — "rested on the defendant. . . . This was the rule when the Fifth Amendment was adopted, and it was the American rule when the Fourteenth Amendment was ratified." *Patterson* v. *New York*, *supra* at 202. (Citations omitted.) For authorities applying the rule to the insanity defense, see Wharton, Homicide § 665, at 551 (2d ed. 1875); 1 Hale, History of the Pleas of the Crown 33 (1736). Chief Justice Parker, instructing the jury in a murder case tried before him and Justices Jackson and Putnam in 1817, is reported to have stated "[t]hat if the Jury were *satisfied*, the prisoner was in a state of mental derangement by the visitation of Providence, he was not a moral agent, and could not be guilty" (emphasis added). Trial of William M'Donnough on an Indictment for the Murder of His Wife, Elizabeth M'Donnough, before the Hon. Supreme Judicial Court of the Commonwealth of Massachusetts 65 (Bangs 1818). See *id.* at 67 ("[Your Counsel] attempted by evidence and argument to *shew* that at the time the deed was perpetrated, you were visited by Divine Providence with a derangement of mind . . . . The jury were instructed by the Court, that if this were satisfactorily *proved*, you were not a free moral agent capable of committing a crime . . .") (emphasis added). "[T]his was a subject entirely for the Jury to decide." *Id.* at 65.

By the middle of the Nineteenth Century, members of this court clearly placed the burden on the defendant to show insanity by a preponderance of the evidence. Indeed, the "presumption of sanity" appears originally to have meant precisely this allocation of the burden of proof. In the murder trial reported in *Commonwealth* v. *Rogers*, 7 Met. 500 (1844), Chief Justice Shaw told the jury that the "ordinary presumption" was that "a person is of sound mind, until the contrary appears." *Id.* at 504. When asked by the jury whether they must be satisfied beyond a doubt of the defendant's insanity in order to acquit him, the

Chief Justice replied that the jury could find the defendant insane "if the preponderance of the evidence" favored such a finding. *Id.* at 506.[6]

In the trial reported in *Commonwealth* v. *Eddy*, 7 Gray 583 (1856), the defendant argued that the Commonwealth was required to show sanity beyond a reasonable doubt and that the "presumption of sanity" could not meet the Commonwealth's burden once conflicting evidence as to sanity had been introduced. See *id.* at 583. The court held instead that the defendant was required to prove insanity as of the time of his otherwise criminal act "by a preponderance of the whole evidence in the case." *Id.* at 584 (charge to jury by Metcalf, J., in trial over which he and Bigelow and Merrick, JJ., presided). Even though the burden to prove sanity was said to be on the Commonwealth, the "presumption of sanity" met this burden and shifted it to the defendant. See *id.* Cf. *Commonwealth* v. *Heath*, 11 Gray 303, 304 (1858) (charge to jury by Thomas, J., in trial over which he and Dewey and Metcalf, JJ., presided) ("The law presumes men and women of the age of the prisoners to be sane, to be responsible agents . . . till the contrary is shown. The presumption of law stands till it is met and overcome by the evidence in the case"); *Commonwealth* v. *McKie*, 1 Gray 61, 65 (1854) ("[t]here may be cases" — "such as insanity, for instance" — "in which the burden of proof is shifted upon the defendant").

Massachusetts was among a number of jurisdictions in the middle of the Nineteenth Century that required criminal defendants to show insanity by a preponderance of the evidence. See, e.g., *United States* v. *Lawrence*, 4 Cranch C.C. 514, 515, 26 F. Cas. 886 (C.C.D.C. 1835) (No. 15,576). See also Wharton, *supra* at § 666, at 551-553 & 552 n.5. A few jurisdictions, including England, required the defendant to prove his insanity beyond a reasonable doubt. See *Leland* v. *Oregon*, 343 U.S. 790, 797 (1952); Wharton, *supra* at § 666, at 551-552; *Regina*

---

[6]The definition of criminal insanity articulated by Chief Justice Shaw in *Commonwealth* v. *Rogers*, 7 Met. 500 (1844), was not modified in substance in Massachusetts until *Commonwealth* v. *McHoul*, 352 Mass. 544 (1967), when we adopted the American Law Institute's definition of insanity. We regarded our adoption of the ALI definition "as an evolutionary restatement of our rule rather than [as] a substantively new rule." *Id.* at 547. See *id.* at 553. Whatever differences there may be between the two definitions do not render irrelevant what this court said about the burden of proof as to insanity in cases prior to the *McHoul* decision.

v. *Stokes*, 3 Car. & K. 185, 188, 175 Eng. Rep. 514, 515 (1848).[7] A third group of jurisdictions required the prosecution to prove sanity beyond a reasonable doubt. See Wharton, *supra* § 667, at 554-556.

Later in the Nineteenth Century, it appears, our nominal allocation of the burden of proof as to sanity began to shift in favor of the defendant. At the same time, the "presumption of sanity" began to play a role that was clearly independent of the court's articulation of this burden. At the trial of Jesse H. Pomeroy (appeal reported at *Commonwealth* v. *Pomeroy*, 117 Mass. 143 [1875]), over which Chief Justice Gray and then Justice Morton presided, the court told counsel that the Commonwealth was required to prove "everything essential" beyond a reasonable doubt, but that this burden, "so far as the matter of sanity is concerned, is ordinarily satisfactorily sustained" by the presumption of sanity. Wharton, Homicide app. VII, at 754 (2d ed. 1875), quoted in *Davis* v. *United States*, 160 U.S. 469, 483 (1895). The court went on to say, however, that "when the circumstances are all in, on the one side and on the other; on the one side going to show a want of adequate capacity, on the other side going to show usual intelligence . . . the burden

---

[7]The English rule may have been mitigated in practice by a counter-presumption that shifted the burden of proof to the Crown once the defendant had made an adequate showing of past insanity. See, e.g., W.M. Best, Presumptions of Law and Fact 186-187 (1844). See also 1 G.D. Collinson, Idiots, Lunatics, and Other Persons Non Compotes Mentis 52, 55 (1812). For relatively recent decisions that adopt or apply a version of this rule, see generally Annot., Presumption of Continuing Insanity as Applied to Accused in Criminal Case, 27 A.L.R.2d 121 (1953). See *Milam* v. *State*, 255 Ga. 560, 563 (1986); *Mills* v. *State*, 256 A.2d 752, 755 (Del. 1969). We have found no mention of such a counter-presumption in our criminal cases. It may be that our old requirement that insanity be shown as of the time of the defendant's otherwise criminal act operated in such a way as to reject implicitly any such presumption. See, e.g., *Commonwealth* v. *Rogers*, 7 Met. 500, 501, 502, 503 (1844) (charge to jury by Shaw, C.J.); Trial of William M'Donnough on an Indictment for the Murder of His Wife, Elizabeth M'Donnough, before the Hon. Supreme Judicial Court of the Commonwealth of Massachusetts 65 (Bangs 1818) (charge to jury by Parker, C.J.). See also 1 Hale, Pleas of the Crown 34 (1736) ("if a man be a lunatick, and hath his *lucida intervalla*, and this be sufficiently proved, yet the law presumes the acts or offenses of such a person to be committed in those intervals, wherein he hath the use of reason, unless by circumstances or evidences it appears they were committed in the time of his distemper; and this also holds in civils, as well as in criminals"); T. Cooper, Insanity and Nuisance, Tracts Medical Jurisprudence at 381 (Cooper ed. 1819); L. Shelford, Lunatics, Idiots, and Persons of Unsound Mind 50, 63, 458-667 (1833).

rests where it was in the beginning — upon the government to prove the case beyond a reasonable doubt." *Wharton, supra.* Charging the jury, Chief Justice Gray stated explicitly that the burden was on the government to show that the defendant was a "capable person" at the time he committed the crime. *Id.* at 756. Although the presumption of sanity normally met this burden, "where, as in this case, there comes in evidence, on the one side and the other — evidence of circumstances, evidence of opinion — . . . offered for the purpose of showing, on the one side, unsoundness of mind, and on the other, for the purpose of confirming the presumption of soundness, it will be for you, taking the whole case together, to say whether you are satisfied that the government has proved the whole case." *Id.* Chief Justice Gray said explicitly that the jury were to consider the presumption of sanity "as well as all the facts" in making this determination. *Id.* See also J.M. Yerrinton, Official Report of the Trial of Henry K. Goodwin for the Murder of Albert D. Swan in the Supreme Judicial Court of Massachusetts 708 (1887) (charge to jury by C. Allen, J., in trial over which he and Gardner, J., presided) (language similar to that used at Pomeroy trial); Wharton, *supra* at § 666, at 552 n.5 (describing Pomeroy as "modif[ying]" doctrine of our older cases). Cf. *Commonwealth* v. *Chance,* 174 Mass. 245, 250 (1899) (Holmes, C.J.) (dictum).

*Commonwealth* v. *Johnson,* 188 Mass. 382, 388 (1905), seems to have been the first appellate decision in which this court stated that the Commonwealth must prove the sanity of the defendant beyond a reasonable doubt. See *Commonwealth* v. *Keita,* 429 Mass. 843, 853 (1999). It is not at all clear that the court was aware in *Johnson* that it was departing from what had been accepted practice in the middle of the Nineteenth Century.[8] *Johnson* is hardly strong evidence for the proposition that changing our reasonable doubt formulation would offend a fundamental principle of justice. Cf. *State* v. *Blair,* 732 A.2d 448, 452

---

[8] In *Commonwealth* v. *Johnson,* 188 Mass. 382, 388 (1905), the court cited four authorities for the proposition that the Commonwealth was required to prove sanity beyond a reasonable doubt: *Commonwealth* v. *Heath,* 11 Gray 303 (1858); *Davis* v. *United States,* 160 U.S. 469 (1895); Chief Justice Gray's jury charge in the Pomeroy trial; and Justice C. Allen's jury charge in the Goodwin trial. *Commonwealth* v. *Heath* is silent on the allocation of the burden of proof as to sanity. *Davis* merely announces the Federal rule on this subject. The two remaining authorities, as I have indicated, employ the reasonable doubt standard, albeit in conjunction with the "presumption of sanity."

(N.H. 1999) ("requiring the defendant to prove insanity by clear and convincing evidence does not violate Part I, Article 15 of the New Hampshire Constitution").[9] Compare *People ex rel. Juhan* v. *District Court for Jefferson County*, 165 Colo. 253, 260, 263 (1968) (holding, in light of history of State jurisprudence, that requiring defendant to show insanity by preponderance of evidence violates due process clause of State Constitution).

It is likely that either the State or Federal Constitution requires that evidence bearing on the sanity of a defendant be admissible so far as it shows whether he had the mental state, or mens rea, that is an element of the crime with which he is charged. To instruct a jury that evidence of insanity "could not be considered in determining whether there was a reasonable doubt about the State's case . . . would relieve the State of its burden and plainly run afoul of *[In re] Winship*'s[, 397 U.S. 358 (1970),] mandate." *Martin* v. *Ohio*, 480 U.S. 228, 233-234 (1987) (placing burden on defendant to prove self-defense by preponderance of the evidence does not violate due process, provided that evidence of self-defense is admissible where relevant to proof of elements of offense charged). See *Montana* v. *Egelhoff*, 518 U.S. 37, 63 (1996) (plurality opinion) (O'Connor, J., dissenting, with whom Stevens, Souter, and Breyer, JJ., joined) ("Meaningful adversarial testing of the State's case requires that the defendant not be prevented from raising an effective defense, which must include the right to present relevant, probative evidence"); *Commonwealth* v. *Matthews*, 406 Mass. 380, 392-393 (1990); *Commonwealth* v. *Grey*, 399 Mass. 469, 470-471 (1987); *United States* v. *Skodnek*, 896 F. Supp. 60, 62 (D. Mass. 1995). But see *Montana* v. *Egelhoff*, *supra* at 42 (Scalia, J., with whom Rehnquist, C.J., and Kennedy and Thomas, JJ., joined) (upholding State statute forbidding use of intoxication evidence to show absence of mens rea) ("the proposition that the Due Process Clause guarantees the right to

---

[9] In all respects conceivably relevant to the allocation of the burden of proof as to sanity in criminal proceedings, the text of Part 1, art. 15, of the New Hampshire Constitution is almost identical to that of art. 12 of the Massachusetts Constitution. Prior to a 1966 amendment that added a fourth sentence to art. 15, the text of art. 15 was nearly the same as that of art. 12. A 1984 amendment to art. 15 made some stylistic changes and added a proviso to the third sentence. The proviso and the extra sentence protect rights that have nothing to do with the burden of proof as to sanity in criminal proceedings.

introduce all relevant evidence is simply indefensible"); *id.* at 56 ("dictum" in *Martin* v. *Ohio, supra,* is "incorrect" if it means that due process clause requires admissibility of all evidence relevant to elements of crime). Cf. *Davis* v. *United States,* 160 U.S. 469, 485 (1895) ("the crime of murder necessarily involves the possession by the accused of such mental capacity as will render him criminally responsible for his acts"). But mens rea, unlike sanity, is an element of many crimes. That proof of the former must be shown beyond a reasonable doubt says nothing as to what should be the standard of proof for the latter.

Second, the Legislature's silence on the propriety of the current formulation does not divest us of the power to alter it. Chief Justice Wilkins acknowledged as much in *Commonwealth* v. *Keita, supra* at 853-854. See *Walker* v. *Butterworth, supra* at 1079 n.6 (as to sanity, "the burden of proof is strictly a judicially created standard in Massachusetts"); *Boston Gas Co.* v. *Department of Pub. Utils.,* 405 Mass. 115, 119 (1989). Cf. *Commonwealth* v. *Berry,* 420 Mass. 95, 112 (1995). Nor as a prudential matter should this silence deter us from announcing a change in the burden of proof on sanity, especially when the preponderance rule more accurately describes our actual practice than did the problematic formulation that we abandon.

Third, a preponderance standard would be simple to explain to jurors even in cases in which mens rea is at issue as well as criminal responsibility. Trial judges would need only to explain that despite the burden on the defendant to show insanity by a preponderance of the evidence, the burden nonetheless remains on the prosecution to prove all elements of an offense, including mens rea, beyond a reasonable doubt. Compare the jury instructions quoted in *Leland* v. *Oregon,* 343 U.S. 790, 794-795 & n.8 (1952).[10] Evidence bearing on sanity would remain admissible when it sheds light on the question of mens rea, as would be often but not always the case. See *Commonwealth* v. *Kostka,* 370 Mass. 516, 532 n.15 (1976), quoting *Mullaney* v. *Wilbur,* 421 U.S. 684, 706 (1975) (Rehnquist, J., concurring) (insanity

---

[10]I note in passing that I would not anticipate any significant change in our doctrine as to when the evidence is sufficient to warrant a jury instruction on the issue of criminal responsibility. See, e.g., *Commonwealth* v. *Seabrooks,* 425 Mass. 507, 515 (1997). If there is some evidence of a lack of criminal responsibility and the defendant requests an instruction on criminal responsibility, the instruction must be given.

of defendant bears no "necessary relationship to the existence or nonexistence of the required mental elements of the crime [charged]" [brackets in original]); *United States* v. *Pryor*, 960 F.2d 1, 3 (1st Cir. 1992).

Finally, it is true that adopting a preponderance formulation would be likely to have little effect on the number of verdicts of not guilty by reason of insanity. This is because the "presumption of sanity" has allowed the prosecution to demonstrate a defendant's sanity without eliminating all significant doubts as to the fact. That is but another way of saying that the prosecution has not been required to prove sanity beyond a reasonable doubt. It follows that the reasonable doubt formulation is inapposite as a description of the true allocation of burdens between the Commonwealth and the defendant as to proof of the defendant's mental condition. See *Commonwealth* v. *Keita, supra* at 847 n.2 ("In practical effect, permitting the presumption to meet the Commonwealth's burden of proof may place the burden of overcoming that presumption on the defendant"); *Commonwealth* v. *Mutina*, 366 Mass. 810, 815 n.2 (1975) ("it may be questionable whether the 'beyond a reasonable doubt' standard and the 'presumption of sanity' can logically coexist in a case where there has been extensive evidence of insanity with no medical evidence to the contrary"); *Walker* v. *Butterworth*, 599 F.2d 1074, 1077 (1st Cir. 1979) ("Instructing the jury to weigh this presumption necessarily lessens the government's burden of proof. The use of this evidentiary device can be viewed as artificially aiding the government in satisfying its burden of production or as diluting the standard of 'beyond a reasonable doubt.' Either way, the standard of proof has been altered by a judicially created mechanism"). Cf. *Commonwealth* v. *Casey*, 428 Mass. 867, 869 (1999) ("At oral argument, experienced defense counsel said that he would readily accept the burden of proving, by a preponderance of the evidence, a client's lack of criminal responsibility, if in turn the judge did not give a presumption of sanity instruction").

I think that it is more accurate to describe our practice as requiring the defendant to show the jury that a preponderance of the evidence shows that he lacked criminal responsibility. This formulation better reflects the broad discretion that we have historically allowed the jury in determining sanity. "The judge 'cannot direct the jury how they shall decide.' " *Commonwealth* v. *Keita, supra* at 847, quoting *Commonwealth* v.

*Smith*, 357 Mass. 168, 180 (1970). See *Commonwealth* v. *Keita, supra* at 845-846. Such discretion is warranted for at least two reasons. First, the jury are best placed to assess the credibility of witnesses to the defendant's manifestations of his mental condition. Second, "[t]he concept underlying the test of irresponsibility because of mental disease or defect is necessarily imprecise." *Commonwealth* v. *Ricard*, 355 Mass. 509, 515 (1969). See *Commonwealth* v. *McHoul*, 352 Mass. 544, 551 (1967). Cf. *Commonwealth* v. *Laliberty*, 373 Mass. 238, 242-243 (1977), and authorities cited. In light of their collective knowledge of human nature, juries are no less equipped than medical experts and judges to assess defendants' capacities for responsible action.

Such a revised description of the allocation of burdens as to insanity in criminal cases would render unnecessary the concept of a "presumption of sanity" that would favor the Commonwealth. Retaining the "presumption" while placing the nominal burden of proof on the defendant would run the risk of altering the actual allocation of burdens of proof as to insanity without reducing the likelihood of juror confusion. See Eule, The Presumption of Sanity: Bursting the Bubble, 25 UCLA L. Rev. 637, 698 (1978). Cf. *Walker* v. *Butterworth, supra* at 1077 & nn.3, 4. Some jurisdictions have both placed the burden on the defendant to show sanity and allowed the use of the "presumption." See *Commonwealth* v. *Kostka, supra* at 529, and authorities cited. A preponderance formulation, however, would effectively give the Commonwealth the benefit of the "presumption of sanity" without any need for trial judges to inform jurors of the fact. See *Commonwealth* v. *Kappler, supra* at 602 (Abrams, J., concurring). Cf. *Commonwealth* v. *Keita, supra* at 854 (Abrams, J., concurring in part and dissenting in part) ("underlying [the preponderance] approach is the presumption that most people are sane").

If the preponderance formulation is adopted and the "presumption of sanity" is discarded, the difference between the *Keita* formulation and the new formulation would be in essence a semantic one. Insofar as the new formulation would aid the clarity and accuracy of jury instructions, it is likely that its use, coupled with the abandonment of the "presumption," would lead to more accurate and consistent determinations of criminal responsibility by juries. Cf. *Commonwealth* v. *McHoul, supra* at 553.

I would therefore adopt the preponderance formulation. I would acknowledge explicitly that the Commonwealth need not prove a defendant's sanity beyond a reasonable doubt. Rather, the defendant must show insanity by a preponderance of the evidence. No mention would need to be made of any "presumption" or "inference" concerning the fact that the great majority of persons ordinarily appear to be sane. This new rule would apply in all cases to be tried after today. See *Commonwealth* v. *Buiel*, 391 Mass. 744, 746-747 (1984); *Commonwealth* v. *Rodriguez*, 370 Mass. 684, 692 (1976); *Commonwealth* v. *Mutina, supra* at 823 n.12; *Myers* v. *Commonwealth*, 363 Mass. 843, 856 n.14 (1973). Cf. *Bradford* v. *Baystate Med. Ctr.*, 415 Mass. 202, 205 (1993).[11]

---

[11]This proposed change in the articulation of the burden of proof as to insanity would require modest revision of the Model Jury Instructions on Homicide (1999). In keeping with current law, the instructions put the burden on the Commonwealth to prove beyond a reasonable doubt that the defendant was criminally responsible at the time he committed the acts of which he is accused. See generally *id.* at 50-54 & 74-76 nn.59-76. The instructions also allude to the "presumption of sanity." See *id.* at 51 & 75 n.64.

The proposed change would not extend to any other affirmative defense concerning which we have said that the Commonwealth has the burden of proving beyond a reasonable doubt the absence of the defense once it is properly raised. Cf. *Commonwealth* v. *Keita, supra* at 852 n.9 (declining to reconsider conclusion in *Commonwealth* v. *Rodriguez*, 370 Mass. 684, 687-688 [1976], that Federal due process principles require "that, when the issue of self-defense is properly before the trier of fact, the Commonwealth must, as matter of due process, prove beyond a reasonable doubt that the defendant did not act in self-defense").